STATE OF NORTH CAROLINA v. JONATHAN LOUIS CRAWFORD

No. 443A89

(Filed 14 August 1991)

**1. Criminal Law § 50.1 (NCI3d) — expert testimony — voluntariness of water consumption**

Testimony by an expert in pediatric critical care medicine that the amount of water consumed by the victim would not voluntarily be taken by a six-year-old boy was a proper subject matter for an expert opinion. N.C.G.S. § 8C-1, Rule 702.

**Am Jur 2d, Homicide § 398.**

STATE v. CRAWFORD

[329 N.C. 466 (1991)]

## 2. Criminal Law § 50.1 (NCI3d) — expert testimony on ultimate issue

Testimony by an expert witness was not inadmissible because it encompassed the ultimate issue to be decided by the trier of fact. N.C.G.S. § 8C-1, Rule 704.

**Am Jur 2d, Homicide § 398.**

## 3. Criminal Law § 50.1 (NCI3d) — expert testimony — voluntariness of water consumption — victim threatened or coerced

Expert opinion testimony that the six-year-old victim would not "voluntarily" drink the quantity of water which he consumed and that the victim was "threatened" or "coerced" did not contain legal terms of art not readily apparent to the witness so as to render the testimony inadmissible, since the common, everyday meanings of those terms are consistent with the legal definitions. Furthermore, the admission of the expert testimony was not prejudicial to defendant where defendant admitted at trial that he coerced the child victim to drink the water to "flush out his system."

**Am Jur 2d, Homicide § 398.**

## 4. Homicide § 25.1 (NCI3d) — murder by torture — instruction on malice not required

The trial court did not err in not specifically instructing upon malice as a prerequisite to a finding of murder by torture since the commission of torture implies the requisite malice, and a separate showing of malice is not necessary.

**Am Jur 2d, Homicide §§ 267, 269, 500.**

## 5. Homicide § 21.6 (NCI3d) — first degree murder by torture — sufficiency of evidence of torture

The State presented adequate evidence of torture to support defendant's conviction of the first degree murder of his girlfriend's six-year-old child by torture where the evidence tended to show that the child died as a result of water intoxication after defendant had coerced him to drink large quantities of water; the jury could infer an intent to cause the child grievous pain from defendant's pattern of using extraordinary disciplinary methods to punish and humiliate the child for disobeying rules; expert testimony was presented that the child's stomach was distended to accommodate large quantities

STATE v. CRAWFORD

[329 N.C. 466 (1991)]

of water and that this is very painful; evidence showed that the child vomited dozens of times as he was urged to drink more and more water; other testimony indicated that the fluid that filled the child's lungs would have created a sensation similar to suffocation and that the swelling of his brain resulting from the ingestion of water created a tremendous headache, which culminated in a scream followed by blindness; and there was adequate evidence for the jury to find that defendant's acts in this instance were for the purpose of punishment.

Am Jur 2d, Homicide § 85.

What constitutes murder by torture. 83 ALR3d 1222.

6. **Criminal Law § 21.5 (NCI3d)— first degree murder—sufficient evidence of premeditation and deliberation**

The evidence was sufficient to support the trial judge's instructions on first degree murder with premeditation and deliberation where it tended to show that the six-year-old son of defendant's girlfriend died as a result of water intoxication after he was coerced by defendant to drink large quantities of water; previous ill will by defendant toward the child victim was shown through testimony of defendant's pattern of extraordinary disciplinary procedures intended to oppress and humiliate the victim; the manner of killing, which involved the painful ingestion of large quantities of water over a period of two to three hours, indicates a particularly brutal method of killing; and evidence indicated that the victim suffered from bruises to his head and buttocks possibly inflicted during this same period of time.

Am Jur 2d, Homicide §§ 85, 433, 438, 439.

7. **Homicide § 25.1 (NCI3d)— first degree murder by torture— instruction defining torture**

The trial court's instruction that torture is "the course of conduct by one or more persons which intentionally inflicts grievous pain and suffering upon another . . . " adequately defined torture for purposes of first degree murder. The instruction was not deficient in failing to require that the pain be inflicted for pain's sake or for the torturer's own sake.

Am Jur 2d, Homicide §§ 48, 499.

STATE v. CRAWFORD

[329 N.C. 466 (1991)]

8. **Homicide § 4.1 (NCI3d)— murder by torture—statute not unconstitutionally vague**

In light of the common understanding of what defines torture, the murder by torture statute is not unconstitutionally vague and puts a reasonable person on notice of what is forbidden. N.C.G.S. § 14-17.

**Am Jur 2d, Homicide § 48.**

9. **Criminal Law § 33.2 (NCI3d)— murder of child by torture—grandmother's advice to mother—irrelevancy**

In a prosecution of defendant for the murder by torture of his girlfriend's six-year-old son by coercing him to drink large quantities of water over a short period of time, testimony that the child's grandmother told the mother to watch the child and give him plenty of fluids was irrelevant and inadmissible to support defendant's defense that he was administering a "home remedy" and was not punishing the child where there was no evidence that the mother conveyed this advice to defendant.

**Am Jur 2d, Homicide § 270.**

10. **Criminal Law § 34.7 (NCI3d)— murder by torture—prior disciplinary acts—competency to show intent, motive, common plan, absence of accident**

In a prosecution of defendant for first degree murder by torture of his girlfriend's six-year-old son by coercing the child to drink large quantities of water as a punishment for disobeying a rule, evidence describing prior extraordinary disciplinary techniques carried out by defendant against the child during the year preceding the child's death was properly admitted for the limited purpose of showing intent, motive, common plan and absence of mistake or accident. Furthermore, the trial court did not abuse its discretion in admitting this evidence as being more probative than prejudicial. N.C.G.S. § 8C-1, Rules 403, 404(b).

**Am Jur 2d, Homicide §§ 298, 316.**

11. **Homicide § 25.2 (NCI3d)— premeditation and deliberation—inference from manner of killing—instruction supported by evidence**

The trial court did not err in instructing the jury that premeditation and deliberation could be inferred from the means

STATE v. CRAWFORD

[329 N.C. 466 (1991)]

or manner of the killing where there was evidence that defendant coerced the six-year-old victim to drink water until he died, despite observing the child's repeated vomiting and complaints of headaches, since this evidence was ample to support premeditation and deliberation through circumstantial evidence of the means or manner of the killing.

**Am Jur 2d, Homicide § 501.**

APPEAL as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by *Hight, J.*, at the 24 April 1989 Criminal Session of Superior Court, ALAMANCE County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court 13 March 1991.

*Lacy H. Thornburg, Attorney General, by Debra· C. Graves, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Mark D. Montgomery, Assistant Appellate Defender, for defendant-appellant.*

MEYER, Justice.

In 1988, six-year-old Christopher West lived with his mother, Angela West, his younger brother, Shaun, and his sister, Sara, in a Burlington apartment. Defendant, Angela West's boyfriend, moved in with them in September of that year. On 1 October 1988, Christopher awoke early and broke a house rule by taking food from the kitchen without permission. The State produced evidence at trial that showed defendant had developed a pattern of using extraordinary disciplinary methods intended to punish and humiliate Christopher for disobeying rules. On the following day, Christopher awoke with a minor rash, which defendant attributed to sherbet Christopher had eaten. Defendant attempted to "flush out [Christopher's] system" by coercing him to drink large quantities of water over the next two to three hours. Christopher complained, but defendant continued to coerce him to drink. Finally, the water intake caused Christopher to scream, convulse, and lose his eyesight. After being taken to the hospital unconscious, where he was diagnosed as suffering from water intoxication, Christopher was pronounced brain dead and was removed from a respirator the next day. A jury found defendant guilty of first-degree murder and of felony child abuse. After a sentencing hearing and upon its finding of no aggravating circumstances, the jury recommended

a sentence of life imprisonment. The trial court sentenced defendant to life imprisonment for first-degree murder and arrested judgment on the conviction for felony child abuse. We find no error.

The State's evidence tended to show the following. In the spring of 1987, defendant and Angela West met through a mutual friend and, by the summer, were dating regularly. After defendant left his job in February 1988, he spent more time with Angela West and soon began to fill the role of disciplinarian of the children as well.

The State introduced testimony describing a number of incidents involving extraordinary disciplinary methods to show by circumstantial evidence an absence of mistake and an intent by defendant to punish Christopher on 2 October 1988. Defendant testified that certain of his disciplinary techniques were inappropriate but contends that they were done in good faith, and in any event, he agreed to stop using inappropriate disciplinary measures after meeting with an investigator from the Department of Social Services (DSS) in May of 1988.

Testimony as to defendant's disciplinary techniques was as follows. In the late winter of 1988, at Angela West's request, defendant punished Christopher for allegedly starting a fire in nearby woods. Defendant affixed a sign around Christopher's neck which read, "I sat [sic] the woods on fire, and I lied to my mama." Christopher was required to stand outside with the sign around his neck for between ten and twenty minutes and to recite aloud the words on the sign. When Christopher would try to go back into the apartment, defendant would push him back outside.

Defendant testified to paddling the children on the soles of their feet in order to conceal bruising, to giving the children cold showers "to cool them down" when "they were in an excited state," to putting hot sauce on their tongues, and to washing their mouths out with soap. The latter two disciplinary methods were to prevent "lying and cussing." Other testimony indicated that Christopher had such a physical reaction to the soap used that his mouth "puffed up."

Additionally, a neighbor testified that in the late spring or early summer of 1988, she saw Christopher wearing a diaper, carrying a baby bottle, and crying. When asked at the time why

Christopher was wearing a diaper, defendant responded that "he was being punished, because he was a sissy."

One of Angela West's friends, who visited the apartment frequently, testified that she saw Christopher disciplined on more than one occasion by being required to stand in the corner. When Christopher cried, defendant would taunt him by saying, "Look at the baby. Chris is a little baby."

Another witness testified that defendant asked her if she had ever seen anyone drink hot sauce before. Christopher cried and screamed in fright when defendant said this; then, as the visitor left, she heard Christopher screaming, crying, and saying it was "hot" as defendant poured the hot sauce into a glass. Another witness testified that defendant had told her that Christopher learned from humiliation.

Defendant's extraordinary punishment procedures were not limited to Christopher. Evidence presented at trial indicated that Sara had been forced to sleep in a urine-soaked bed, which was "his way of teaching [her] not to wet the bed," and in another instance, defendant put Sara's urine-soaked underwear on her head. When these instances of punishment occurred, Sara was two or three years old. Finally, a witness testified that in the summer of 1988, defendant forced Shaun to stand with his face up against a tree in the park. A school counselor testified that defendant told her that he was on a "mission" to help Angela West with disciplinary problems. Defendant denies that he made such a statement.

DSS began an investigation of the West family on 9 May 1988. A DSS investigator visited the West home, where defendant stated that Christopher was a bully and needed discipline. Defendant related a number of his disciplinary methods to the investigator, who reported defendant to the police. He was arrested in June for misdemeanor child abuse of the West children. However, on 2 August 1988, those charges were dismissed.

West entered a service agreement on 16 May 1988 with DSS. The agreement in this instance provided that defendant would have no contact with any of the West children. The agreement expired in August 1988 and was not renewed. Defendant was asked to submit to a mental health evaluation, due to the misdemeanor child abuse charges against him, but did not do so on the advice

of his attorney. Christopher, however, was examined by a pediatrician, who found no indication of mental instability or mental illness.

Defendant moved in with the West family in September while still unemployed and looked after Christopher's brother Shaun. Shaun had been removed from kindergarten, defendant contends, to prevent him from being expelled. There were at least two meetings at approximately that same time with DSS in which the agency continued to press, to no avail, for removal of the children from the home.

On 1 October 1988, while Angela West was at work and defendant was home alone with the three children, defendant discovered that biscuits were missing from the kitchen and confronted Shaun and Christopher about breaking the house rule that forbade them from going downstairs to the kitchen before an adult was awake to accompany them. Shaun admitted breaking the rule and implicated Christopher. Defendant spanked the boys on the buttocks and required them to stand in the corner. When Angela West returned home, the children were still standing in the corner, having been spanked a second time for not standing quietly. At that time, West and defendant noted a mild rash or reddish mark on Christopher's forehead and face. West restricted the boys to their room for the day.

The next morning, defendant awoke late. After following defendant downstairs, Shaun told defendant that Christopher had vomited during the night at least twice. Defendant noted that Christopher's rash was worse. Upon learning that Christopher had eaten sherbet on the previous morning, defendant concluded that Christopher had food poisoning. West wanted to take Christopher to the hospital, but defendant convinced her otherwise. Defendant testified that he was afraid to take Christopher to the hospital for fear that he would be accused of child abuse, and the children would be taken away.

Defendant suggested to West that the best course to take would be to "flush out [Christopher's] system." Defendant urged Christopher to drink large quantities of water. Christopher vomited dozens of times on the couch, in the bathroom, and in a bucket placed nearby. Nonetheless, defendant continued to ply him with water, despite Christopher's complaining of a headache and of sleepiness. In all, during this treatment Christopher ingested a large quantity of water (defendant testified on one occasion three

pitchers and on another to four or five quarts; one physician testified "a little bit more than four quarts"; and another physician estimated "eight to nine quarts"). Finally, Christopher screamed loudly. His eyes widened, and he began convulsing. He fell to the floor and exclaimed that he could not see.

Angela West ran next door to a phone, and a neighbor called for an ambulance. Defendant took Christopher to the hospital, although an ambulance arrived within minutes after his departure. A witness testified that defendant stopped for several minutes at an intersection on the way to the hospital.

At the hospital, Christopher experienced two more seizures, his condition deteriorated, and he was transferred to Duke University Medical Center. The next day, Christopher was pronounced brain dead and was disconnected from a respirator. Although not the cause of death, an autopsy revealed recent bruising to Christopher's head, thigh, and buttocks, some of which, an expert testified, were not of the type that result from normal childhood activity. When police officers searched the West apartment, they found, on the coffee table in the living room near where Christopher drank the water, among other things, a half-filled pitcher of water, a bottle of hydrogen peroxide, a bottle of "Safety Bowl, non-acid restroom and bowl cleaner," and an empty bottle of Lysol toilet bowl cleaner.

The defense introduced evidence to show an absence of intent to harm Christopher.

On cross-examination of a pathologist called by the State, defendant elicited testimony that death by water intoxication is a rare cause of death. The doctor testified that this was the first case of water intoxication with which he had direct experience.

Defendant testified in his own behalf that after he met with DSS, he agreed to stop using the disciplinary measures that DSS considered inappropriate. Defendant further testified that the sherbet that Christopher had eaten had been in the freezer for several weeks. He thought that Christopher's rash and slight fever were a result of food poisoning caused by the sherbet and that was why he told Christopher to drink water. Defendant stated that Christopher only drank three pitchers of water and that when Christopher appeared to have a convulsion, he immediately took him to the hospital. He explained that he stopped his vehicle on

the side of the road on the way to the hospital to check for Christopher's pulse and to buckle seat belts on both of them. Defendant testified that the purpose of giving Christopher the water was not to punish him but rather was a "mistaken effort to treat him."

A Burlington pediatrician testified that he had examined the West children in May of 1988 and had found no evidence that they were physically abused.

The case was tried as a capital case, and the jury returned a verdict finding defendant guilty of felony child abuse and of first-degree murder by means of torture and by premeditation and deliberation. Following a sentencing proceeding, the jury declined to find the only aggravating circumstance submitted, that the murder was especially heinous, atrocious, or cruel. The trial court sentenced defendant to life imprisonment for first-degree murder and arrested judgment on the conviction for felony child abuse.

The State's theories on both the charges of felony child abuse and of first-degree murder by means of torture and by premeditation and deliberation were that defendant forced Christopher to consume the large quantity of water to punish and ultimately kill Christopher for having eaten sherbet without permission. The defense contended that defendant forced Christopher to drink the water to "flush out his system," and therefore Christopher's death was an accident or, at most, involuntary manslaughter. Consequently, an ultimate issue in the case was defendant's intent to torture and kill Christopher.

As alternative theories, defendant contends that there was insufficient evidence presented of premeditation and deliberation and of murder by torture and that the trial court's instructions on murder by torture were inadequate.

I.

As defendant's first assignment of error, he contends that the trial court erred in allowing certain expert testimony by a witness qualified as an expert in pediatric critical care medicine. The State responds by noting that the testimony was relevant to show the nature of the injury that caused Christopher's death. The allegedly improper testimony is as follows:

Q. Doctor Boyd, based on the history you obtained, your examination of Christopher West, and his course while in the

hospital at Duke University Medical Center, do you have an opinion whether Christopher's condition on arrival at Duke University Medical Center was the result of an intentional physical injury?

[DEFENSE ATTORNEY]: OBJECTION.

COURT: OVERRULED

A. I do.

Q. What is that opinion?

A. It's my opinion, based on the factors you mentioned in the question, and on my knowledge of the amount of water that would be necessary to cause the serum sodium to get to that level, and on my knowledge of the normal behavioral activities of a six year old boy, that this amount of water would not be voluntarily taken by a six year old, and, therefore, would be forced upon him in some manner, of threat, or coercion, or something of that nature.

Defendant argues, first, that "there was an insufficient foundation for the doctor's testimony" or, in effect, that the evidence was an improper subject matter for expert opinion; second, that it encompassed the ultimate issue of the case; and third, that it was testimony which "utilized several legal terms and concepts."

[1] As to the allegation that the doctor's opinion lacked a proper foundation and was an improper subject matter for expert opinion, defendant contends that expert testimony as to the "normal behavioral activities of a six year old boy" was not helpful to the jury because such knowledge is based on common experience, and expert opinion testimony was unnecessary to assist the jury. In considering the adequacy of the subject matter for the expert's testimony here, we note a statutory provision directly on point. It provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.

N.C.G.S. § 8C-1, Rule 702 (1988). The qualification of a witness as an expert is normally left to the sound discretion of the trial

judge. *State v. Combs*, 200 N.C. 671, 158 S.E. 252 (1931). The subject matter of the expert testimony must merely be such that it would be helpful to the fact finder. Our Court of Appeals has noted that:

> "It seems abundantly clear that, despite occasional technical roadblocks erected by the 'rule' against invading the jury's province and by notions about the jury's sublime capacity to draw its own inferences, there can be expert testimony upon practically any facet of human knowledge and experience." Stansbury's N. C. Evidence, Subject Matter of Expert Testimony, § 134, p. 438.

*State v. Raines*, 29 N.C. App. 303, 307, 224 S.E.2d 232, 234, *disc. rev. denied*, 290 N.C. 311, 225 S.E.2d 832 (1976); *see generally* 1 Brandis on North Carolina Evidence § 134 (3d ed. 1988). Here, the witness, qualified as an expert in pediatric critical care medicine, could relate the sensations that a six-year-old boy would feel after drinking such a large quantity of water, which, under normal conditions, would have signaled him to stop drinking. We hold that the trial court did not err in allowing the expert's testimony.

[2] As to defendant's contention that the testimony encompassed the ultimate issue to be decided by the trier of fact, we first note the provisions of the applicable evidentiary rule. Rule 704 provides that "[t]estimony in the form of an opinion or inference is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." N.C.G.S. § 8C-1, Rule 704 (1988). Consistent with the language of the statute, we have previously held that an expert's testimony may embrace the ultimate issue to be decided by the trier of fact. *State v. Shank*, 322 N.C. 243, 249, 367 S.E.2d 639, 643 (1988) (expert testimony "as to whether a defendant had the capacity to make and carry out plans, or was under the influence of mental or emotional disturbance . . . relates to an ultimate issue to be decided by the trier of fact" and should have been admitted). However, the Court has held that expert testimony as to a " 'legal conclusion . . . [is inadmissible] at least where the standard is a legal term of art which carries a specific legal meaning not readily apparent to the witness.' " *State v. Rose*, 323 N.C. 455, 459, 373 S.E.2d 426, 429 (1988) (quoting *State v. Smith*, 315 N.C. 76, 100, 337 S.E.2d 833, 849 (1985) ). Having determined that the testimony relating to the ultimate issue is not objectionable, we now address defendant's contention that the expert's testimony "utilized several legal terms and concepts" to

STATE v. CRAWFORD

[329 N.C. 466 (1991)]

determine if the testimony contained legal terms of art not readily apparent to the witness.

[3] Defendant makes essentially two arguments. First, he contends that the fact that Christopher could not "voluntarily" drink this quantity of water is the same as a finding that the defendant was legally responsible for Christopher drinking the water and therefore legally responsible for Christopher's death. Second, defendant argues that testimony that Christopher was "threatened" or "coerced" is an opinion that a legal standard had been met. We disagree. The terms "voluntary," "threatened," and "coerced" have no specific technical legal meanings as they were used here and are not "words of art" as are such terms as "premeditation and deliberation" or "proximate cause." *Rose*, 323 N.C. at 460, 373 S.E.2d at 429 ("Premeditation and deliberation are legal terms of art."); *State v. Ledford*, 315 N.C. 599, 617, 340 S.E.2d 309, 321 (1986) ("proximate cause" is a legal term of art); *see also State v. Smith*, 315 N.C. 76, 337 S.E.2d 833 (1985). In this case, the common, everyday meaning of the terms is consistent with the legal definition. Moreover, we note again that defendant admits that he coerced Christopher to drink the water, intending to make him throw up. Expert testimony as to whether Christopher's acts were "voluntary," "threatened," or "coerced" only confirms what defendant admits, that is, that he coerced Christopher to drink. The testimony in question was properly admitted here.

We note further that the defendant, at trial and in his brief to this Court, admitted that he coerced Christopher to drink the water to "flush out his system." Therefore, even assuming, *arguendo*, that the admission of the expert's testimony was error, there is no reasonable possibility that, had the error in question not been committed, a different result would have been reached at trial. N.C.G.S. § 15A-1443(a) (1988).

II.

[4] Defendant next contends that the trial court erred in not specifically instructing upon malice as a prerequisite to a finding of murder by torture. Moreover, defendant argues that, even if malice were not required, the evidence did not show that defendant caused Christopher great pain. Defendant also contends that there was inadequate evidence to support the theory of premeditation and deliberation.

MURDER BY TORTURE

The trial court instructed the jury on murder by torture as follows:

Now, I charge that for you to find the defendant guilty of first degree murder by means or [sic] torture, the state must prove two things beyond a reasonable doubt.

First, that the defendant intentionally tortured the victim.

Torture is the course of conduct by one or more persons which intentionally inflicts grievous pain and suffering upon another for the purpose of punishment, persuasion, or sadistic pleasure.

Course of conduct, is the pattern of the same or similar acts, repeated over a period of time, however short, which established that there existed in the mind of the defendant a plan, scheme, system or design to inflict cruel suffering upon another.

Intent is a mental attitude which is seldom provable by direct evidence. It must ordinarily be proved by circumstances from which it may be inferred. You arrive at the intent of a person by such just and reasonable deductions from the circumstances proven as a reasonably prudent person would ordinarily draw therefrom.

Second, the state must prove that the torture was a proximate cause of the victim's death.

A proximate cause is a real cause, a cause without which the victim's death would not have occurred.

. . . .

Now, members of the jury, bearing in mind that the burden of proof rests upon the state to establish the guilty [sic] of the defendant beyond a reasonable doubt, I charge that if you find from the evidence that the killing of the deceased was accidental, that is, that the victim's death was brought about by an unknown cause, or that it was from an unusual or unexpected event from a known cause, and you also find that the killing of the deceased was unintentional, that at the time of the homicide the defendant was engaged in the performance of a lawful act, without any intention to do harm,

and that he was not culpably negligent, if you find these to be the facts, remembering that the burden is upon the state, then I charge that the killing of the deceased was a homicide by misadventure, and if you so find, it would be your duty to render a verdict of not guilty as to this defendant.

Noting that the trial court did not instruct on malice, defendant contends that a specific finding of malice is required for murder by torture. Since malice was not specifically found by the jury in defendant's conviction of murder by torture, defendant contends that his conviction should be reversed. We disagree.

Murder by torture is classified in N.C.G.S. § 14-17 as first-degree murder. That statute provides as follows:

A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, *torture*, or by any other kind of willful, deliberate, and premeditated killing, or which shall be committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first degree, and any person who commits such murder shall be punished with death or imprisonment in the State's prison for life as the court shall determine pursuant to G.S. 15A-2000
. . . .

N.C.G.S. § 14-17 (Cum. Supp. 1990) (emphasis added). The statute, on its face, makes no reference to a showing of malice. Since murder is not defined by the statute, we follow the general rule that where a statutory term is undefined, we employ the common law defini-tion. N.C.G.S. § 4-1 (1986).

Common law murder has been defined as "any intentional and unlawful killing of a human being with malice aforethought, express or implied." *State v. Vance*, 328 N.C. 613, 622, 403 S.E.2d 495, 501 (1991). This Court has determined that when the homicide was perpetrated by means of torture, there is no requirement of a showing of intent to kill. *State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986).

We . . . now hold that premeditation and deliberation is not an element of the crime of first-degree murder perpetrated by means of poison, lying in wait, imprisonment, starving, or *torture*. Likewise, a specific intent to kill is equally irrelevant

when the homicide is perpetrated by means of poison, lying in wait, imprisonment, starving, or *torture*; and we hold that an intent to kill is not an element of first-degree murder where the homicide is carried out by one of these methods.

*Id.* at 203, 344 S.E.2d at 781 (emphasis added).

With regard to the next requirement, malice, as it is ordinarily understood, means not only hatred, ill will, or spite, but also that condition of mind which prompts a person to take the life of another intentionally, without just cause, excuse, or justification, or to wantonly act in such a manner as to manifest depravity of mind, a heart devoid of a sense of social duty, and a callous disregard for human life. *State v. Snyder*, 311 N.C. 391, 317 S.E.2d 394 (1984); *State v. Reynolds*, 307 N.C. 184, 297 S.E.2d 532 (1982); *State v. Jenkins*, 300 N.C. 578, 268 S.E.2d 458 (1980). We have held that malice in the case of felony murder is "transferred" when the underlying felony is committed. In *State v. Gardner*, 315 N.C. 444, 340 S.E.2d 701 (1986), we stated:

> The felony-murder rule is a rule of ancient application under which there is a fictional transfer of the malice which plays a part in the underlying felony to the unintended homicide so that the homicide is deemed committed with malice.
>
> . . . .
>
> In the typical case of felony-murder, there is no malice in "fact", express or implied; the malice is implied by the "law". What is involved is an intended felony and an unintended homicide. The malice which plays a part in the commission of the felony is transferred by the law to the homicide. As a result of the fictional transfer, the homicide is deemed committed with malice; and a homicide with malice is common law murder.
>
> 2 Wharton's Criminal Law § 145 (1979).

*Id.* at 456-57, 340 S.E.2d at 710; *accord State v. Womble*, 292 N.C. 455, 233 S.E.2d 534 (1977). Murder by torture is analogous to felony murder in that malice may be implied by the very act of torturing the victim. Torture is a dangerous activity of such reckless disregard for human life that, like felony murder, malice is implied by the law. The commission of torture implies the requisite malice, and a separate showing of malice is not necessary.

[5] By this assignment of error, defendant also contends that the State did not present adequate evidence of torture. The record indicates otherwise. Torture was defined by the trial court in pertinent part as "the course of conduct by one . . . which intentionally inflicts grievous pain and suffering upon another for the purpose of punishment, persuasion, or sadistic pleasure." We note first that, based on the evidence of a pattern of extraordinary disciplinary methods, the jury could have inferred an intent to cause Christopher grievous pain. There was also adequate evidence of "grievous pain and suffering." Through expert testimony, evidence was presented that Christopher's stomach was distended to accommodate large quantities of water and that this "is very painful." Moreover, Christopher vomited "dozens" of times as he was urged to drink more and more water. Other testimony indicated that the fluid that filled Christopher's lungs would have created a sensation similar to suffocation and that the swelling of his brain that resulted from the ingestion of water created a tremendous headache, which culminated in a scream, followed by blindness. Lastly, based on defendant's past pattern of punishing Christopher, there was adequate evidence for the jury to find that defendant's acts were for the purpose of punishment. We hold here that the State presented adequate evidence of torture.

MURDER WITH PREMEDITATION AND DELIBERATION

[6] Defendant also contends that the State failed to present sufficient evidence of premeditation and deliberation to submit an instruction to the jury. We disagree. The trial court instructed the jury on first-degree murder, with premeditation and deliberation, as follows:

Now, I charge that for you to find the defendant guilty of first degree murder with malice, with premeditation and deliberation, the state must prove five things, beyond a reasonable doubt.

First: That the defendant intentionally and with malice, killed the victim.

Malice means not only hatred, ill will or spite as it is ordinarily understood. To be sure, that is malice. But, it also means the condition of mind which prompts a person to take the life of another intentionally, or to intentionally inflict serious

injury upon another, which proximately results in his death, without just cause, excuse or justification.

Second: The state must prove that the defendant's act was a proximate cause of the victim's death.

A proximate cause is a real cause, a cause without which the victim's death would not have occurred.

Third: The state must prove that the defendant intended to kill the victim.

Intent is a mental attitude seldom provable by direct evidence. It must ordinarily be proved by circumstances from which it may be inferred. An intent to kill may be inferred from the nature of the defendant's act, the manner in which it was made, the conduct of the parties, and other relevant circumstances.

Fourth: The state must prove that the defendant acted with premeditation. That is, that he formed the intent to kill the victim over some period of time, however short, before he acted.

Fifth: That the defendant acted with deliberation, which means that he acted while he was in a cool state of mind. This does not mean that there had to be a total absence of passion or emotion. If the intent to kill was formed with a fixed purpose, not under the influence of some suddenly aroused violent passion, it is immaterial that the defendant was in a state of passion, or excited when the intent was carried into effect.

Neither premeditation, nor deliberation are usually susceptible of direct proof. They may be proven by proof of circumstances from which they may be inferred, such as the conduct of the defendant, before, during and after the killing, and the manner in which, or means by which the killing was done.

Premeditation has been defined as some thought beforehand, for some length of time, however short. *State v. Biggs*, 292 N.C. 328, 233 S.E.2d 512 (1977). Premeditation need not be for a particular amount of time. *State v. Myers*, 299 N.C. 671, 263 S.E.2d 768 (1980). Deliberation is the intention to kill, executed in a cool state of blood in furtherance of a fixed design, to gratify a feeling of revenge or to accomplish some unlawful purpose. *Id.* Premedita-

tion and deliberation must generally be proved by circumstantial evidence, since they are processes of the mind and are seldom proved by direct evidence. *State v. Buchanan*, 287 N.C. 408, 215 S.E.2d 80 (1975). Certain relevant circumstances which tend to show premeditation and deliberation are "ill-will or previous difficulty between the parties; . . . the dealing of lethal blows after the deceased has been felled and rendered helpless; and . . . evidence that the killing was done in a brutal manner." *State v. Williams*, 308 N.C. 47, 69, 301 S.E.2d 335, 349, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983).

In this case, there is ample evidence to support the instructions on murder with premeditation and deliberation. Previous ill will by defendant toward Christopher was shown through testimony of extraordinary disciplinary procedures intended to oppress and humiliate Christopher. The manner of killing, which involved the painful ingestion of large quantities of water over a two- to three-hour period, indicates a particularly brutal method of killing. In addition, evidence indicated that Christopher suffered from bruises to the head and buttocks, possibly inflicted during this two- to three-hour period. For the above reasons, the evidence is sufficient to support the trial judge's instructions on first-degree murder with premeditation and deliberation.

III.

[7] Having previously determined that malice is implied in a finding of torture in a crime of murder by torture, we must now determine if the instructions given on torture in this case were adequate. Defendant argues that the trial judge's instructions did not properly define the crime of torture. We disagree. The trial judge defined torture as

the course of conduct by one or more persons which intentionally inflicts grievous pain and suffering upon another for the purpose of punishment, persuasion, or sadistic pleasure.

Course of conduct, is the pattern of the same or similar acts, repeated over a period of time, however short, which established that there existed in the mind of the defendant a plan, scheme, system or design to inflict cruel suffering upon another.

Defendant contends that the instructions given did not properly define the crime of torture and that the acts he committed were

not envisioned by the legislature as punishable as first-degree murder. Defendant notes that corporal punishment is a widely used form of disciplining children. Additionally, defendant argues that the instructions do not require that the torturer inflict pain for pain's sake. Defendant faults the present instructions as not *requiring* that the pain be inflicted for pain's sake or for the torturer's own sake.

By finding a course of conduct and the intentional infliction of grievous pain and cruel suffering resulting in death, the jury has satisfied the statutory and constitutional requirements. The instructions given by the trial judge adequately defined torture for purposes of first-degree murder.

IV.

[8]   Defendant next contends that the torture statute is unconstitutionally vague. We do not find it so. Essentially, defendant argues that a reasonable person of ordinary intelligence would not be on notice that his conduct was a crime.

A common understanding of torture would put a person of ordinary understanding on notice that coercing a six-year-old to drink quart after quart of water over a two- to three-hour period, despite his vomiting dozens of times and complaining of headaches, would constitute torture for purposes of the murder statute. The trial judge's instructions, defendant argues, would encompass even legal corporal punishment if the punishment caused death. In response to defendant's argument, the State notes that, by its very definition, a "lawful" punishment cannot be a punishment, carried out over a period of time, that is intended to inflict *grievous* pain and cruel suffering. Such punishment would be unlawful punishment, and if death results, it is punishable as first-degree murder.

We hold that in light of the common understanding of what defines torture, the statute is not unconstitutionally vague and puts a reasonable person on notice of what is forbidden. *See, e.g., State v. Elam*, 302 N.C. 157, 273 S.E.2d 661 (1981).

V.

[9]   Defendant next contends that the exclusion of certain testimony denied him his federal and state constitutional right to present a defense. Defendant sought to allow the testimony of Judy Clayton, who is Angela West's mother and the grandmother of Christopher.

STATE v. CRAWFORD

[329 N.C. 466 (1991)]

After a voir dire of Ms. Clayton's proposed testimony, it was apparent that she would have testified that she told her daughter to watch Christopher and to give him plenty of fluids. Defendant contends that this testimony was relevant to show the theory of his defense, that defendant was administering a "home remedy" and was not punishing Christopher. The State objected on the grounds that the testimony was irrelevant and hearsay. We agree that the testimony was properly excluded. There was no evidence that Angela West conveyed this advice to defendant, and it was therefore irrelevant. Having upheld the trial court's discretion as to the testimony's lack of relevancy, we need not address the issue of hearsay.

VI.

[10] Defendant next contends that testimony of prior instances of defendant's punishing and disciplining Christopher was irrelevant as being too remote and dissimilar and, even if admissible for a relevant purpose, was highly prejudicial evidence of defendant's character and propensity to commit the crime for which he was charged. We do not agree. As previously indicated, the State introduced a great deal of evidence describing prior disciplinary techniques carried out by defendant against Christopher. The trial court gave the following limiting instructions as to this evidence:

> Evidence has been received tending to show that the defendant used disciplinary techniques through May 9, 1988, which were deemed inappropriate by the Department of Social Services. This evidence was received solely for the purpose of showing that the defendant had a motive for the commission of the crime charged in this case, that the defendant had the intent, which is a necessary element of the crime charged, in this case, that there existed in the mind of the defendant a plan, scheme, system or design, involving the crime charged in this case, the absence of mistake, and the absence of accident.

> If you believe this evidence, you may consider [it], but only for the limited purpose for which it was received.

The State contends that circumstantial evidence of defendant's intent was appropriate and highly relevant and not too remote or dissimilar. We agree. The acts took place during the year preceding Christopher's death and are sufficiently similar to the coerced consumption of large quantities of water in that they were devious

methods used by the defendant to punish Angela West's children, including Christopher, and demonstrate methods used by defendant to exert control over the children. Defendant's intent is generally determined by circumstantial evidence, and such testimony is highly probative of defendant's intent here. Moreover, motive and common plan are also highly relevant to this case, as is absence of mistake. We therefore hold that the testimony was admissible for these relevant purposes.

Having found that the evidence is admissible for a proper Rule 404(b) purpose, we now address whether the prejudicial effect of the testimony outweighed its probative value. *See* N.C.G.S. § 8C-1, Rule 403 (1988). Absent an abuse of discretion, matters of weighing Rule 403 prejudice are in the sound discretion of the trial judge. *State v. Schultz*, 88 N.C. App. 197, 362 S.E.2d 853 (1987), *aff'd*, 322 N.C. 467, 368 S.E.2d 386 (1988). We note that the trial court conducted a voir dire indicating a careful considera- tion of the prejudicial impact of the testimony. Furthermore, the previously indicated limiting instructions were also given. Based on the record before us, we find no abuse of the trial court's discretion in admitting the evidence as being more probative than prejudicial.

## VII.

[11]   Defendant finally contends that the medical evidence indicated that death was not foreseeable from defendant's conduct. Defendant argues that the trial court's instructions to the jury, to which defendant did not object, that the jury could infer premeditation and deliberation from the means or manner of the killing, con- stituted prejudicial error in violation of defendant's state and federal constitutional rights. As we have often stated, premeditation and deliberation are not susceptible to direct proof and therefore must be inferred from circumstantial evidence. One factor from which premeditation may be inferred is the means or manner of the killing. *State v. Buchanan*, 287 N.C. 408, 215 S.E.2d 80 (1975). Essen- tially, defendant requests that we find as a matter of law that coercing a six-year-old to drink water until he dies cannot evince premeditation and deliberation because no reasonable juror could so find. We disagree. In this case, defendant, over a two- to three- hour period, continued to coerce Christopher to drink water, despite observing Christopher's repeated vomiting and complaints of headaches. The evidence presented in this case, as previously stated,

is ample to support premeditation and deliberation through circumstantial evidence of the means or manner of the killing.

In summary, we hold that defendant received a fair trial, free of prejudicial error, before an impartial judge and jury. The convictions upon which the sentence is based are supported by the evidence.

No error.