STATE OF NORTH CAROLINA v. CLINTON CEBERT SMITH

No. 396A98

(Filed 4 February 2000)

**1. Jury— capital case—jury selection—death penalty views— excusal for cause**

The trial court did not abuse its discretion in excusing for cause in a capital trial a prospective juror who stated that he did not think he could tell the court that he would honestly, fairly, and equally consider the death penalty, who also stated that "if circumstances are just tremendously in favor, maybe [he could consider a sentence of death], but [he is] 99% against it though," and who did not state clearly that he was willing to temporarily set aside his own beliefs in deference to the rule of law.

STATE v. SMITH

[351 N.C. 251 (2000)]

## 2. Jury— capital case—peremptory challenge—racial discrimination—failure to make prima facia showing

The trial court did not err in finding that defendant failed to make a prima facie showing that the State's peremptory challenge of a black prospective juror was based on race where defendant showed only that the State exercised six of its eight peremptory challenges to excuse blacks and that blacks make up fifty to sixty percent of the county; defendant did not make any specific Batson challenge to the other five peremptorily excused black prospective jurors, and the trial court thus had no obligation to inquire into the reasons for striking those jurors; the prosecutor had accepted the first black to enter the jury box and had also struck whites before striking this prospective juror; defendant, the victims, and the State's key witnesses were all black; the prosecutor did not make any racially motivated comments or ask any racially motivated questions of the black prospective jurors; and seven of the fourteen prospective jurors accepted by both the State and defendant were black.

## 3. Evidence— DSS investigation—bad character—admissibility to show motive—hearsay—harmless error

In a prosecution of defendant for the first-degree murder of his six-year-old daughter and the attempted murder of his ex-girlfriend and his other two children, testimony by a DSS program manager concerning her investigation showing that defendant had lied in court in a hearing to terminate his child support payments was not improperly admitted to show his bad character but was properly admitted to show that his motive for the murder and attempted murders was so that he would not have to pay child support. Even if this evidence was hearsay, its admission was harmless error since it was already before the jury without objection by defendant.

## 4. Evidence— statement to co-worker—bad character—motive and plan

Evidence that defendant told a co-worker that DSS was taking over half his paycheck for child support and he was tired of paying was admissible under Rule 404(b) to show motive and plan in a prosecution for the first-degree murder by poisoning of defendant's six-year-old daughter and the attempted murders by poisoning of his ex-girlfriend and his other two children. N.C.G.S. § 8C-1, Rule 404(b).

STATE v. SMITH

[351 N.C. 251 (2000)]

**5. Evidence— bad character—failure to object—not plain error**

Testimony that defendant told a witness that he used to drown puppies and kittens in a peanut sack and that he saw a farmer's dog eat peanuts contaminated with a pesticide and that it did not take much to make the dog sick was not improperly admitted in a prosecution of defendant for first-degree murder by poisoning of his six-year-old daughter and attempted murder of his ex-girlfriend and other two children, even if the testimony was used to show defendant's bad character, where defendant failed to object to this testimony at trial and failed to show plain error in light of the overwhelming evidence of defendant's guilt, including defendant's threats to kill his ex-girlfriend and their children, his trip to a farm to obtain a pesticide he knew was extremely deadly, his showing the pesticide to two people in a brown paper grocery bag, his trip to his ex-girlfriend's house to put the pesticide in Kool-Aid, and his later refusal to say anything at the hospital about the real reason for his children's grave illness even while medical personnel fought to save their lives.

**6. Homicide— murder and attempted murder by poison—malice instruction not required**

The trial court did not err in denying defendant's request to instruct the jury on the element of malice for charges of first-degree murder by means of poison and attempted first-degree murder by means of poison since malice is implied by law for a murder by poison, and a separate showing of malice is not necessary.

**7. Homicide— first-degree murder by poison—attempted first-degree murder by poison—involuntary manslaughter instruction not warranted**

Defendant was not entitled to an instruction on the lesser-included offense of involuntary manslaughter in a prosecution for first-degree murder by means of poison and attempted first-degree murder by means of poison where the evidence showed that defendant had knowledge of and experience with farm pesticides; he made a trip to a farm to obtain the deadly pesticide used in the murder; he concocted a story as to why he needed the poison; he showed the poison in a brown paper grocery bag to two people; he went to his ex-girlfriend's house to put the pesticide in Kool-Aid; and as his children lay dying or deathly ill, he failed to say anything at the hospital as to the real reason his children were sick.

**8. Sentencing— capital—evidence of indecent liberties conviction—not prosecutorial misconduct**

The prosecutor did not engage in "abusive gamesmanship" and defendant was not prejudiced in a capital sentencing proceeding when the prosecutor introduced testimony by defendant's cousin concerning defendant's prior conviction of taking indecent liberties with the cousin's teenage daughter and a detective's testimony about the prior conviction where the jury had prior knowledge from the testimony of defendant's own character witnesses during the sentencing proceeding concerning defendant's guilty plea and conviction for indecent liberties, and the trial court sustained defendant's objection to further questioning of the detective after he stated only that he began his investigation of the indecent liberties case with the cousin's family.

**9. Criminal Law— prosecutor's argument—capital sentencing—remarks about defendant's psychologist**

The prosecutor's argument in a capital sentencing proceeding that defendant's expert in clinical psychology could not possibly tell what was going on in defendant's mind two years ago, that it was amazing what people would do for money, that the psychologist's report showed nothing but that defendant was sleep deprived, and that the psychologist ought to be on the Psychic Friends Network was not so grossly improper as to require the trial court to intervene ex mero motu. The thrust and bulk of the argument was that the expert testimony did not provide a factual basis for finding that defendant murdered while under the influence of an emotional or mental condition.

**10. Sentencing— capital—instructions—meaning of life imprisonment**

Although the better practice would be for the trial court to instruct the jury in a capital sentencing proceeding in the words of N.C.G.S. § 15A-2002 that "a sentence of life imprisonment means a sentence of life without parole," the trial court did not err by instructing that "[i]f you unanimously recommend a sentence of life imprisonment without parole, the Court will impose a sentence of life imprisonment without parole."

**STATE v. SMITH**

[351 N.C. 251 (2000)]

**11. Sentencing— capital—mitigating circumstances—no significant criminal history—failure to submit—assaultive behavior**

The trial court did not err by failing to submit to the jury in a capital sentencing proceeding the (f)(1) mitigating circumstance of no significant history of prior criminal activity where defendant planned and carried out the murder of his six-year-old daughter and attempted murders of his ex-girlfriend and their other two children by means of poison, and the evidence of defendant's prior criminal activity was a conviction for indecent liberties with a minor approximately one year prior to this offense, previous assaults on his ex-girlfriend, recently communicated death threats against the ex-girlfriend, recently communicated death threats against the ex-girlfriend's new boyfriend, and defendant's history of drowning young puppies and kittens. N.C.G.S. § 15A-2000(f)(1).

**12. Sentencing— capital—mitigating circumstances—peremptory instruction not warranted**

The trial court did not err in refusing to give peremptory instructions to the jury in a capital sentencing proceeding on the (f)(2) mental or emotional disturbance and the (f)(6) impaired capacity mitigating circumstances where defendant's evidence supporting these mitigating circumstances was controverted by the State's evidence. N.C.G.S. § 15A-2000(f)(2) and (f)(6).

**13. Sentencing— capital—death penalty not disproportionate**

A sentence of death imposed upon defendant for first-degree murder was not excessive or disproportionate where the evidence showed that defendant coldly and designedly planned and carried out the murder of his six-year-old child and attempted to murder his other two children and their mother, his ex-girlfriend, by means of poison because he did not want to pay child support and because he did not want anyone else to date his former girlfriend; defendant placed the poison in Kool-Aid in the home of the ex-girlfriend and the three children; the poisoning caused a long, lingering, painful, and agonizing death of an innocent child; and the jury found the (e)(9) heinous, atrocious, or cruel aggravating circumstance and the (e)(11) course of conduct aggravating circumstance. N.C.G.S. § 15A-2000(e)(9) and (e)(11).

STATE v. SMITH

[351 N.C. 251 (2000)]

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Butterfield, J., on 13 April 1998 in Superior Court, Halifax County, upon a jury verdict finding defendant guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments was allowed by the Supreme Court on 11 June 1999. Heard in the Supreme Court 15 November 1999.

*Michael F. Easley, Attorney General, by Valérie B. Spalding, Special Deputy Attorney General, for the State.*

*Leslie Ann Laufer for defendant-appellant.*

FREEMAN, Justice.

On 7 April 1998, defendant Clinton Cebert Smith was found guilty of the January 1996 first-degree murder by poisoning of his six-year-old daughter, Britteny, and the attempted murders by poisoning of his ex-girlfriend, Sylvia Cotton (Cotton); his three-year-old son, Jamal; and his four-year-old daughter, Breanca.

The State's evidence tended to show that defendant dated Cotton for a number of years before they broke off their relationship. They had three children together, including Britteny, Jamal, and Breanca. Although all three children were born locally, defendant did not attend their births, and Cotton did not know where defendant was when each child was born. In 1992, when Cotton was asked to name the father of her children, she lied at defendant's request and gave a fictitious name because defendant was already paying child support for another child and could not afford to pay for Cotton's children. Defendant played no role in the upbringing of Cotton's three children and would only, if pressed very hard, give Cotton money.

The State's evidence revealed that defendant wanted to resume his relationship with Cotton but that Cotton was not interested because she had a new boyfriend whom she had met at her job in Tarboro in 1995. Cotton testified that on 25 December 1995, defendant asked her whether she was sleeping with her co-worker/new boyfriend. Cotton replied yes. Defendant became angry and told her if he could not have her, then her new boyfriend could not have her either. He also stated that he was not going to let anyone else raise his children. In another conversation that month, defendant told Cotton he was going to go to her job to pick her up and if he saw her walk out with her new boyfriend, he would shoot them both.

**STATE v. SMITH**

[351 N.C. 251 (2000)]

The State presented evidence that defendant worked part-time for Bruce Josey at Gallberry Farm. In connection with his duties at the farm, defendant handled farm chemicals and had access to the locked chemical bins containing Di-Syston and Temik, both lethal pesticides. All the farm workers were verbally warned of the dangers in handling the farm chemicals. The State also presented evidence that defendant worked part-time at an Etna gas station. In October 1995, when defendant discovered Cotton had a new boyfriend, he told Jimmy Brinson, an Etna co-worker, that if he found out who the new boyfriend was, he would "get him." Thurman Arrington, one of defendant's co-workers at Gallberry Farm, also testified that on another occasion, defendant said he was going to Tarboro, the town where Cotton worked, to beat up her boyfriend.

The State's evidence further tended to show that around Christmas 1995, defendant asked Brinson whether police would have sufficient evidence to convict defendant if he told somebody he was going to kill a person and then did so. Brinson also testified that defendant told him the Department of Social Services (DSS) was taking over half his paycheck for child support for the three children, and he was tired of paying.

On 16 January 1996, Arrington arrived at the Etna gas station at 6:30 a.m. to get some refreshments. Defendant was inside the Etna gas station and asked Arrington what time they were supposed to report to work at the farm. Defendant then said he was going to get some Temik because his father wanted to kill some big rats at his house. Defendant left the gas station in his truck. At about 7:30 a.m. or 8:30 a.m., Arrington was sitting in his truck outside a barbecue diner, along with co-worker Anthony Hines, when defendant drove up behind him.

Defendant got out of his truck and walked to the driver's side of Arrington's truck carrying a brown paper grocery bag. Defendant told Arrington that he got the Temik to kill the rats at his father's house. Defendant opened the bag so Arrington could see. Arrington told defendant the chemical was dangerous and to be careful with it. Hines got out of Arrington's truck and walked around it to talk to defendant. Hines also saw the contents of defendant's bag. After defendant drove away, Arrington told Hines the contents of the bag looked like Di-Syston. Defendant did not work at the farm that day.

On her way to work that same day, Cotton took her three children across the street from her house to babysitter Ellen Lassiter's house

at the usual time of about 5:30 a.m. Cotton dropped her children off early in the mornings because she did not own a car; she had to catch a ride from a co-worker; and it took about thirty minutes to get to her work. Lassiter put Jamal and Breanca on the school bus at 7:00 a.m. Between 7:30 a.m. and 8:00 a.m., while Britteny was still at Lassiter's house waiting for her late school bus, Lassiter and Britteny saw defendant go into Cotton's house. As the morning wore on, Lassiter saw the pickup truck defendant was driving parked about four or five houses away from Cotton's house. Around 10:00 a.m. or 10:30 a.m., Lassiter noticed the truck again, but this time it was parked beside defendant's sister Patty's house, directly across the street from Lassiter, and next door to Cotton's house. Lassiter last noticed the truck around 4:00 p.m.

Nathaniel Williams, who lived on the same street as Cotton and Lassiter, testified that about 10:00 a.m. he saw defendant coming out of Cotton's house. A short time later, at 10:15 a.m., he again saw defendant coming out of Cotton's house, this time with a folded over brown grocery bag in his hand. Nathaniel Williams shouted a greeting to defendant, and they both laughed.

A few minutes after 5:00 p.m. that day, Cotton got home from work, went inside her house, and noticed some balloons and a box on top of her VCR in the living room. She knew they had to be from defendant because he was the only one who went into her house without her permission. Cotton testified she had never given defendant a key to her house. In fact, Cotton had lost her own key to the house a while back and had to get in her house through the front window.

Around 5:30 p.m., Cotton arrived at Lassiter's house to pick up her three children. Lassiter told Cotton that defendant had gone into her house. Cotton replied that defendant had left balloons and other items there in an attempt to get back together again. Thereafter, Cotton and her three children went to their home, and Cotton began cooking dinner. Cotton noticed the kitchen had a funny smell. Cotton later testified that it was the same smell as the State's exhibit of Di-Syston.

While Cotton was preparing dinner, Breanca asked for some Kool-Aid. Cotton got a pitcher of cherry Kool-Aid out of the refrigerator and poured the drink into glasses for her three children. One of the children told Cotton the Kool-Aid did not taste right. Thereafter, Cotton tasted the Kool-Aid and found it to be gritty and bitter.

**STATE v. SMITH**

[351 N.C. 251 (2000)]

Looking into the Kool-Aid pitcher, she saw something that looked like grit and little red strings in the liquid. She subsequently dumped out the contents of the pitcher. Cotton then prepared a fresh batch of Kool-Aid and gave it to her children, along with their dinner.

Sometime after 11:00 p.m., Breanca awakened Cotton because Britteny had wet the bed, she was crying, she had bubbly spit coming from her mouth, and her stomach was hurting. Britteny's stomach appeared swollen. Shortly thereafter, Jamal had diarrhea, and Cotton noticed that his lips were chapped. Cotton tended to her sick children and put them back to bed. Around 11:30 p.m. or 11:45 p.m., Breanca reawakened Cotton because Britteny had wet the bed again. Cotton called her aunt, Carolyn Williams, who took Cotton and the children to the hospital during the early morning hours of 17 January 1996. A doctor gave Britteny and Jamal an injection for vomiting and diarrhea because he thought the problem might be a twenty-four hour virus.

On the way home from the hospital, Breanca began complaining that her stomach was hurting. All three children were sick throughout the night. At about 4:00 a.m., Cotton cleaned the kitchen floor because the children had vomited all over it. Later that morning, when Cotton went to wake her children, she noticed that Britteny's mouth was purplish-grey and that she appeared to have no heartbeat. Cotton called 911, and the ambulance took Britteny and Jamal to the hospital. Cotton and Breanca followed the ambulance in a separate car, driven by Carolyn Williams, to the Our Community Emergency Room in Scotland Neck. Defendant arrived at the emergency room about an hour after Cotton and the others.

While waiting in the emergency room, Breanca began vomiting. The doctors took Breanca where the other two children were in order to monitor her condition as well. Shortly thereafter, Cotton began to feel sick herself. A doctor checked Cotton, who complained about a terrible headache and being disoriented. The doctor gave Cotton oxygen and a tranquilizer. Subsequently, a doctor told Cotton that Britteny had died, and the other two children were being transferred to Pitt Memorial Hospital.

Cotton was allowed to see Britteny for a few minutes. When she got to Britteny's room, Cotton's aunt, one of her cousins, defendant, and a nurse were already there. Defendant asked the nurse whether Britteny had died from carbon monoxide poisoning, and she said it looked like it, but she was not sure. Defendant repeatedly blurted out, without being questioned, that Britteny died from carbon monox-

ide poisoning because of Cotton's cooking stove. The nurse reminded him that they did not know what caused her death. Thereafter, defendant left the room so he could visit his other two children at Pitt Memorial Hospital.

After a few minutes, Cotton began having a terrible headache and became disoriented. She was taken to Nash General Hospital by ambulance. After Cotton checked out of the hospital, her aunt drove her to Cotton's house. Cotton was not permitted to enter her own house, so she went to her aunt's house.

Dr. John Meredith was working at Pitt Memorial on 17 January 1996. Dr. Meredith testified about the steps taken to treat Breanca and Jamal, stating tests revealed the two children were not suffering from carbon monoxide poisoning but had symptoms consistent with organophosphate poisoning. Dr. Meredith also testified that defendant appeared, stating that he was the father of the two children and that they had been poisoned by their mother.

Alice Daniels, a social worker at Pitt Memorial Hospital, testified she was on duty and saw defendant talking to Dr. Meredith on 17 January 1996. Her job was to give emotional support to the family of Breanca and Jamal. Daniels later spoke to defendant, asked him what had happened to the children, and what if anything he had given them to eat or drink. Defendant replied that he had not done anything and that Cotton must have given the children some Kool-Aid.

Later that evening, Cotton went to Pitt Memorial to see Breanca and Jamal. Jamal was in intensive care hooked up to a number of machines because he had great difficulty breathing and had suffered several seizures. Breanca was in a regular room. As Cotton went to see Breanca, she passed defendant in the hallway. Breanca immediately told Cotton that defendant said Cotton was a bad person because she gave bad chicken to the children.

Breanca was released from Pitt Memorial after about a week. Jamal spent two or three days in intensive care and then was moved to a regular room. He was released from Pitt Memorial about two days after Breanca. DSS then took the two children, and Cotton returned to her aunt's house. Cotton was eventually reunited with her children.

On 19 January 1996, defendant saw co-worker Arrington again and told him defendant's mother and father asked that Arrington say nothing about the "rat" poison. While officers were investigating the

case, they found a brown paper grocery bag with traces of Di-Syston in Cotton's trash can. Defendant was arrested on 2 February 1996.

[1] Defendant's first issue on appeal is whether the trial court erred in excusing for cause prospective juror Alfonzia Knight, who indicated he might have difficulty voting in favor of a death sentence. To determine whether a prospective juror may be excused for cause in a capital punishment case, the trial court must consider whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985). Prospective jurors may also be properly excused for cause if they are unable to " 'state clearly that they are willing to temporarily set aside their own beliefs, in deference to the rule of law.' " *State v. Brogden*, 334 N.C. 39, 43, 430 S.E.2d 905, 908 (1993) (quoting *Lockhart v. McCree*, 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149-50 (1986)) (emphasis omitted).

This Court has previously noted that "a prospective juror's bias for or against the death penalty cannot always be proven with unmistakable clarity." *State v. Miller*, 339 N.C. 663, 679, 455 S.E.2d 137, 145, *cert. denied*, 516 U.S. 893, 133 L. Ed. 2d 169 (1995). Thus, the trial court's decision to dismiss a juror for cause is discretionary and will not be disturbed absent an abuse of discretion. *State v. Jaynes*, 342 N.C. 249, 270, 464 S.E.2d 448, 461 (1995), *cert. denied*, 518 U.S. 1024, 135 L. Ed. 2d 1080 (1996).

In the instant case, prospective juror Knight stated he was not really "for" the death penalty. He told the trial court it would be possible for him to recommend death, but he did not think he could tell the court that he would honestly, fairly, and equally consider the death penalty. He also stated that "[i]f circumstances are just tremendously in favor, maybe [he could consider a sentence of death], but [he is] ninety-nine percent against it though." The trial court carefully and meticulously considered this matter, as evidenced by the transcript concerning the *voir dire* of this particular juror. Since Knight did not state clearly that he was willing to temporarily set aside his own beliefs in deference to the rule of law, the trial court did not abuse its discretion in excusing him for cause. Thus, this assignment of error is overruled.

[2] In his second assignment of error, defendant claims the trial court erred in denying his motion to preclude the State from using its peremptory challenges in a racially discriminatory manner during the

jury selection process. The use of peremptory challenges for racially discriminatory reasons violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Batson v. Kentucky*, 476 U.S. 79, 106, 90 L. Ed. 2d 69 (1986). The North Carolina Constitution, Article I, Section 26, also prohibits the exercise of peremptory challenges solely on the basis of race. *See State v. Ross*, 338 N.C. 280, 284, 449 S.E.2d 556, 560 (1994). Defendant contends the State's use of a peremptory challenge to remove prospective juror Freeman Reynolds was race-based and is not supported by the record. He asserts Reynolds' responses to questioning demonstrated he had a good layman's understanding of the law requiring him to weigh the circumstances surrounding the crime.

When evaluating a claim of racial discrimination based on the prosecution's use of peremptory challenges, (1) defendant must establish a *prima facie* case that the peremptory challenge was exercised on the basis of race, and if this showing is made; (2) the burden shifts to the prosecutor to offer a racially neutral explanation to rebut defendant's *prima facie* case; and (3) the trial court must determine whether defendant has proven purposeful discrimination. *State v. Cummings*, 346 N.C. 291, 308-09, 488 S.E.2d 550, 560 (1997), *cert. denied*, 522 U.S. 1092, 139 L. Ed. 2d 873 (1998).

In the instant case, the trial court concluded that defendant had not made a *prima facie* showing that the peremptory challenge was exercised on the basis of race, but the trial court permitted the State to make any comments for the record that it chose to make. Where the trial court rules that a defendant has failed to make a *prima facie* showing, our review is limited to whether the trial court erred in finding that defendant failed to make a *prima facie* showing, even if the State offers reasons for its exercise of the peremptory challenges. *State v. Hoffman*, 348 N.C. 548, 554, 500 S.E.2d 718, 722-23 (1998).

One of the factors to review in determining whether a defendant has made a *prima facie* showing that the peremptory challenge was exercised on the basis of race is whether the prosecutor used a disproportionate number of peremptory challenges to strike African-American jurors in a single case. *State v. Gregory*, 340 N.C. 365, 397-98, 459 S.E.2d 638, 656 (1995), *cert. denied*, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996). Defendant notes the State exercised six of its eight peremptory challenges to excuse blacks, and that number was disproportionate to the fifty to sixty percent of blacks in Halifax County. Defendant claims the trial court also failed to undertake a

**STATE v. SMITH**

[351 N.C. 251 (2000)]

further inquiry into the other five black prospective jurors who had previously been peremptorily excused by the State. Not until the State exercised a peremptory challenge against Reynolds, its eighth, did defendant make his first *Batson* challenge. Further, defendant did not make any specific *Batson* challenge to the other five peremptorily excused black prospective jurors, and therefore, the trial court had no obligation to inquire into the reasons for striking those jurors.

Although not dispositive, one factor tending to refute an allegation of peremptory challenges being exercised on the basis of race is the acceptance rate of black jurors by the prosecution. *Id.* at 398, 459 S.E.2d at 656-57. Here, the prosecutor had accepted the first black to enter the jury box, and had also struck whites before striking prospective juror Reynolds.

Other factors to review in determining whether a defendant has made a *prima facie* showing of peremptory challenges being exercised on the basis of race include defendant's race, the victim's race, the race of the State's key witnesses, and whether the prosecutor made racially motivated statements or asked racially motivated questions of black prospective jurors that raise an inference of discrimination. *Gregory*, 340 N.C. at 397-98, 459 S.E.2d at 656. In the instant case, defendant is black; the murdered child victim, Britteny, was black; and the surviving three victims, two of whom were the State's key witnesses, are black. After carefully reviewing the record, we also conclude that the prosecutor did not make any racially motivated comments, nor did he ask racially motivated questions of the black prospective jurors.

We conclude the trial court did not err in finding that defendant failed to make a *prima facie* showing and, thus, the trial court did not err in denying defendant's challenge to the State's use of its peremptory challenges. Additionally, we note the record shows that the jury was composed of four black males, one black female, three white males, and four white females. The alternates were one black female and one black male. Thus, of the fourteen jurors accepted by both sides, seven were black and seven were white. This assignment of error is overruled.

[3] In his third assignment of error, defendant contends the trial court erred in admitting hearsay, bad character, and prior bad acts evidence in the State's case. More specifically, defendant claims the trial court erred in admitting: (1) alleged hearsay statements of DSS

Program Manager, Melody Beaver; (2) alleged hearsay statements of defendant's daughter, Breanca; (3) certain inadmissible statements made to defendant's Etna co-worker, Jimmy Brinson; and (4) statements allegedly violating evidence Rules 403 and 404. "The erroneous admission of hearsay, like the erroneous admission of other evidence, is not always so prejudicial as to require a new trial." *State v. Ramey*, 318 N.C. 457, 470, 349 S.E.2d 566, 574 (1986). Defendant has the burden of showing error and that there was a reasonable possibility that a different result would have been reached at trial if such error had not occurred. N.C.G.S. § 15A-1443(a) (1999).

In the instant case, DSS worker Melody Beaver testified that beginning 8 November 1994, defendant was ordered to pay child support for his three children. On 13 December 1995, approximately one month before Britteny's death, defendant moved to terminate child support payments, stating as a circumstance that both parents were working and that they had been living together for the past few years. Cotton was not at the courthouse when the motion came on for hearing. Defendant explained his story to a district court judge, who temporarily suspended the child support order. The judge further ordered DSS to investigate Cotton for possible welfare fraud and continued the case. DSS investigated the fraud allegation, finding there was no fraud, Cotton was not receiving welfare, and defendant was not living in her home. On 10 January 1996, Beaver told defendant's lawyer that DSS planned to put on evidence in court showing defendant had lied because he was not living with Cotton, and that DSS would seek to have the child support order reinstated. However, this matter was not pursued because defendant was arrested for the murder of Britteny.

Defendant contends Beaver's testimony was hearsay because the information was not really a personal investigation. Also, defendant claims Beaver's testimony is prejudicial because it tends to show motive and bad character, identifying defendant as the perpetrator. Defendant contends that although Beaver personally checked her computer for certain information, she talked only to her staff, who in turn talked to the people in Scotland Neck, where Cotton and her children had lived. Further, defendant claims there were no notes in Beaver's file describing the conversations with people in Scotland Neck.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in con-

formity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment, or accident." N.C.G.S. § 8C-1, Rule 404(b) (1999). Rule 404(b) is "a general rule of inclusion of relevant evidence of other crimes, wrongs, or acts by a defendant, subject to but one exception requiring its exclusion if its only probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990). The State contends one of defendant's motives for killing his child, and attempting to kill his other two children and ex-girlfriend Cotton, was so he would not have to pay child support. Contrary to defendant's assertions, this evidence was not admitted to show his bad character. Instead, it was properly used to show his motive for the murder and attempted murders, and to show the particular circumstances leading up to them.

Moreover, a review of the record shows that Beaver testified several times concerning this information and that defendant at least twice failed to object. Therefore, even if this evidence was deemed to be hearsay, its admission was harmless error since it was already before the jury.

The trial court admitted several statements by defendant's daughter Breanca, who was four years old at the time of the attempted murder but six years old at the time of trial, including a statement that defendant said Cotton was a bad person because she gave her children some bad chicken. The prosecutor informed the trial court he would not be calling Breanca because she was too young. The trial court concluded Breanca was unavailable because of her tender age. During Cotton's testimony, defendant objected to hearsay statements from Breanca concerning the children's physical suffering. Defendant contends the trial court erred by allowing Cotton to testify without personally examining or observing Breanca before it made a determination that Breanca was not available. *See State v. Fearing*, 315 N.C. 167, 174, 337 S.E.2d 551, 555 (1985). Defendant further claims this testimony was unfairly prejudicial because it tended to show he was trying to cover up his tracks; he was throwing blame on Cotton; and therefore, that he was the perpetrator. Defendant did not assign error to the trial court's ruling on this issue, and therefore, he has abandoned it pursuant to N.C. R. App. P. 28(b)(5). In addition, defendant has failed to show plain error in light of the overwhelming evidence in the record of defendant's guilt.

[4] The State also presented evidence that defendant told an Etna co-worker, Jimmy Brinson, that DSS was taking over half his paycheck for child support, and he was tired of paying. Defendant contends this testimony was prejudicial because it showed he had a motive and started to formulate a plan to poison someone, and it therefore led to the conclusion that he was the perpetrator. As previously mentioned, motive and plan are proper methods for use of this type of evidence under Rule 404(b). In addition, the trial court initially sustained defendant's objections regarding this issue and allowed his motions to strike. The trial court further instructed the jury to disregard the witness' answer. Only after the prosecutor framed the questions in a permissible manner did the trial court overrule defendant's objections. This Court presumes that a jury follows a trial court's instructions. *See State v. Trull*, 349 N.C. 428, 455, 509 S.E.2d 178, 196 (1998), *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 68 U.S.L.W. 3224 (1999). These statements were properly admitted.

[5] Defendant told Brinson he used to take puppies and kittens, put them in a peanut sack, and drown them. He also told Brinson he saw farmer Josey's dog eat peanuts contaminated with Temik, it was "bad stuff," and it did not take much to make the dog sick. Defendant claims this evidence was used to show only his bad character. However, defendant failed to object to this testimony at trial and has failed to show plain error in light of the overwhelming evidence. This evidence includes defendant's threats to kill Cotton and their children, his trip to the farm to obtain a pesticide he knew was extremely deadly, his showing the pesticide to two people in a brown paper grocery bag, his trip to Cotton's house to put it in the Kool-Aid, and his later refusal to say anything at the hospital about the real reason for his children's grave illness even while medical personnel fought to save their lives. Thus, this assignment of error is overruled.

[6] Fourth, defendant claims the trial court erred in denying his request to instruct the jurors on the element of malice for the charges of first-degree murder by means of poison and attempted first-degree murder by means of poison. *See State v. Johnson*, 317 N.C. 193, 201, 344 S.E.2d 775, 780 (1986). The trial court charged the jury as to the murder of Britteny that if it found beyond a reasonable doubt that defendant intentionally administered a substance known to him to be poison to the victim, thereby proximately causing her death, the jury should find defendant guilty of first-degree murder by means of poison. The trial court repeated the above charge for the three first-degree attempted murders as well.

This Court has previously concluded that N.C.G.S. § 14-17 "separat[es] first-degree murder into four distinct classes as determined by the proof: (1) murder perpetrated by means of poison, lying in wait, imprisonment, starving, or torture; (2) murder perpetuated by any other kind of willful, deliberate, and premeditated killing; (3) murder committed in the perpetration or attempted perpetration of certain enumerated felonies; and (4) murder committed in the perpetration or attempted perpetration of any other felony committed or attempted with the use of a deadly weapon." *Johnson*, 317 N.C. at 202, 344 S.E.2d at 781. "Any murder committed by means of poison is automatically first-degree murder." *Id.* at 204, 344 S.E.2d at 782. As this Court has previously stated, "premeditation and deliberation is not an element of the crime of first-degree murder perpetrated by means of poison, lying in wait, imprisonment, starving, or torture; and . . . an intent to kill is not an element of first-degree murder where the homicide is carried out by one of these methods." *Id.* at 203, 344 S.E.2d at 781.

"[M]alice, as it is ordinarily understood, means not only hatred, ill will, or spite, but also that condition of mind which prompts a person to take the life of another intentionally, without just cause, excuse, or justification, or to wantonly act in such a manner as to manifest depravity of mind, a heart devoid of a sense of social duty, and a callous disregard for human life." *State v. Crawford*, 329 N.C. 466, 481, 406 S.E.2d 579, 587 (1991). This Court has already stated that murder by torture, which is in the same class as murder by poison, "is a dangerous activity of such reckless disregard for human life that, like felony murder, malice is implied by the law. The commission of torture implies the requisite malice, and a separate showing of malice is not necessary." *Id.* at 481, 406 S.E.2d at 587-88. We hold that the same reasoning applies for the crime of first-degree murder by poison and conclude that a separate showing of malice is not necessary. Thus, this assignment of error is overruled.

[7] Fifth, defendant claims the trial court erred in denying his request to instruct the jurors on the lesser included offenses of involuntary manslaughter and voluntary manslaughter because they do not require malice. A defendant is entitled to have a lesser included offense submitted to the jury only when there is evidence to support that lesser included offense. *State v. Brown*, 300 N.C. 731, 735-36, 268 S.E.2d 201, 204 (1980). If the State's evidence is sufficient to fully satisfy its burden of proving each element of the greater offense and there is no evidence to negate those elements other than defendant's

denial that he committed the offense, defendant is not entitled to an instruction on the lesser offense. *Johnson*, 317 N.C. at 205, 344 S.E.2d at 782.

"Involuntary manslaughter has been defined as the unlawful and unintentional killing of another without malice which proximately results from an unlawful act not amounting to a felony [and not] naturally dangerous to human life, or by an act or omission constituting culpable negligence." *Id.* at 205, 344 S.E.2d at 782-83. In the instant case, defendant was not entitled to an instruction on involuntary manslaughter. The evidence presented showed defendant had knowledge of and experience with farm pesticides; he made a trip to the farm to obtain the deadly pesticide used in the murder; he concocted a story as to why he needed the poison; he showed the poison in a brown paper grocery bag to two people; he went to Cotton's house to put it in the Kool-Aid; and as his children lay dying or deathly ill, he failed to say anything at the hospital as to the real reason his children were sick. Since the State's evidence was sufficient to fully satisfy its burden of proving each element of first-degree murder by means of poison and attempted first-degree murder by means of poison, and there was no other evidence to negate these elements other than defendant's denial that he committed the offense, defendant was not entitled to an instruction on the lesser included offense of involuntary manslaughter. *See State v. Strickland*, 307 N.C. 274, 293, 298 S.E.2d 645, 657-58 (1983), *overruled in part on other grounds by Johnson*, 317 N.C. 193, 344 S.E.2d 775.

Defendant also appears to contend an instruction on voluntary manslaughter should have been given. This contention is not raised in any assignment of error and is therefore abandoned. N.C. R. App. P. 28(b)(5).

Next, defendant claims the trial court erred in allowing prosecutorial misconduct in the sentencing proceeding of this trial concerning: (1) improper "gamesmanship," and (2) an improper closing argument. As a general rule, counsel is allowed wide latitude in the jury argument during the capital sentencing proceeding. *State v. Soyers*, 332 N.C. 47, 60, 418 S.E.2d 480, 487 (1992). Counsel is permitted to argue the facts that have been presented as well as reasonable inferences that can be drawn therefrom. *State v. Williams*, 317 N.C. 474, 481, 346 S.E.2d 405, 410 (1986). Further, arguments are to be viewed in the context in which they are made and the overall factual circumstances to which they refer. *State v. Womble*, 343 N.C. 667,

692-93, 473 S.E.2d 291, 306 (1996), *cert. denied,* 519 U.S. 1095, 136 L. Ed. 2d 719 (1997).

**[8]** In the instant case, defendant contends the prosecutor engaged in "abusive gamesmanship" because he put on testimony by defendant's cousin, Mary Ann Pittman, concerning defendant's prior conviction for taking indecent liberties with his cousin's teenage daughter. Defendant claims this evidence was already declared inadmissible by the trial court, but the prosecutor introduced it in order to rebut the testimony of twelve witnesses who testified as to defendant's good character. The prosecutor also called Detective Wheeler to further testify about the conviction for taking indecent liberties. Defendant contends the prosecutor flagrantly misrepresented that the detective was going to testify about his investigation of that case.

A review of the record reveals defendant has failed to show prejudice in light of the jury's prior knowledge, including the testimony of defendant's own character witnesses during the sentencing proceeding, concerning defendant's guilty plea and conviction for indecent liberties. Moreover, the trial court immediately instructed the jury to disregard Pittman's answer when the prosecutor sought to elicit hearsay testimony. Further, the trial court sustained defendant's objection to any further questioning of the detective after he was permitted to state to the jury only that he began his investigation with the Pittman family. Thus, the trial court did not err.

**[9]** Defendant also claims the prosecutor made an improper closing argument because he undertook to discredit Dr. Claudia Coleman, a clinical psychologist, through insult and unwarranted personal attacks. Defendant points to the prosecutor's claims that: it was amazing what people would do for money, Coleman could not possibly tell what was going on in defendant's mind two years ago, Coleman's report showed nothing but that defendant was sleep deprived, and Coleman ought to be on the Psychic Friends Network.

Defendant failed to object during closing arguments and "the trial court is not required to intervene *ex mero motu* unless the argument strays so far from the bounds of propriety as to impede defendant's right to a fair trial." *State v. Atkins,* 349 N.C. 62, 84, 505 S.E.2d 97, 111 (1998), *cert. denied,* —— U.S. ——, 143 L. Ed. 2d 1036 (1999). "Trial counsel is allowed wide latitude in argument to the jury and may argue all of the evidence which has been presented as well as reasonable inferences which arise therefrom." *State v. Guevara,*

349 N.C. 243, 257, 506 S.E.2d 711, 721 (1998), *cert. denied*, U.S. , 143 L. Ed. 2d 1013, (1999). "Whether counsel abuses this privilege is a matter ordinarily left to the sound discretion of the trial judge, and we will not review the exercise of this discretion unless there be such gross impropriety in the argument as would be likely to influence the verdict of the jury." *State v. Covington*, 290 N.C. 313, 328, 226 S.E.2d 629, 640 (1976).

Rather than merely focusing on the fact that the witness had been paid, the thrust and bulk of the prosecutor's argument was that the expert testimony did not provide a factual basis for finding that defendant murdered while under the influence of an emotional or mental condition. Consequently, the prosecutor's argument was not so "grossly improper" as to require the trial court to intervene *ex mero motu*.

[10] Next, defendant contends the trial court erred in denying his motion to instruct the jury in the sentencing proceeding about the meaning of life imprisonment. The trial court stated it would "adhere precisely" to the pattern jury instructions. For first-degree murder offenses occurring on or after 1 October 1994, the phrase "without parole" is required when instructing on life imprisonment. N.C.G.S. § 15A-2002 (1999). N.C.G.S. § 15A-2002 provides:

> If the recommendation of the jury is that the defendant be imprisoned for life in the State's prison, the judge shall impose a sentence of imprisonment for life in the State's prison, without parole.
>
> The judge shall instruct the jury, in words substantially equivalent to those of this section, that a sentence of life imprisonment means a sentence of life without parole.

*Id.*

The transcript reveals the trial court instructed the jury, verbatim from the pattern jury instruction, that "[i]f you unanimously recommend a sentence of life imprisonment without parole, the Court will impose a sentence of life imprisonment without parole." N.C.P.I.— Crim. 150.10 (1998). In addition, the verdict sheet stated the jurors could choose between "Life Imprisonment Without Parole" or "Death." While we find the trial court's instructions are substantially equivalent to the statutory requirement, the better practice would be to charge precisely as the statute states: "a sentence of life imprisonment means a sentence of life without parole." N.C.G.S. § 15A-2002.

Thus, the trial court did not err in failing to give the requested instruction.

[11] Further, defendant contends the trial court erred by failing to submit to the jury in the sentencing proceeding the statutory mitigating circumstance that defendant had no significant history of prior criminal activity pursuant to N.C.G.S. § 15A-2000(f)(1). N.C.G.S. § 15A-2000(b) provides:

> Instructions determined by the trial judge to be warranted by the evidence *shall* be given by the court in its charge to the jury prior to its deliberation in determining sentence. In all cases in which the death penalty may be authorized, the judge *shall* include in his instructions to the jury that it must consider any aggravating circumstance or circumstances or mitigating circumstance or circumstances from the lists provided in subsections (e) and (f) *which may be supported by the evidence*, and shall furnish to the jury a written list of issues relating to such aggravating or mitigating circumstance or circumstances.

N.C.G.S. § 15A-2000(b) (1999) (emphasis added). Although the better practice is to request submission of a mitigator at trial, if the evidence is sufficient, defendant's failure to request the submission of the (f)(1) mitigating circumstance does not discharge the trial court from its duty to submit the circumstance if the evidence is sufficient for a juror to reasonably find that the circumstance exists. *State v. Jones*, 346 N.C. 704, 715, 487 S.E.2d 714, 721 (1997).

"When the trial court is deciding whether a rational juror could reasonably find this mitigating circumstance to exist, the nature and age of the prior criminal activities are important, and the mere number of criminal activities is not dispositive." *State v. Geddie*, 345 N.C. 73, 102, 478 S.E.2d 146, 161 (1996), *cert. denied*, 522 U.S. 825, 139 L. Ed. 2d 43 (1997). Unadjudicated crimes may properly be considered in determining the sufficiency of the evidence under (f)(1). *State v. Ingle*, 336 N.C. 617, 643, 445 S.E.2d 880, 893 (1994), *cert. denied*, 514 U.S. 1020, 131 L. Ed. 2d 222 (1995). However, the length of a defendant's criminal history, by itself, is not determinative for purposes of submitting the (f)(1) mitigator. *Jones*, 346 N.C. at 715, 487 S.E.2d at 721.

"A significant history of prior criminal activity for purposes of N.C.G.S. § 15A-2000(f)(1) is one likely to influence the jury's sentence recommendation." *Atkins*, 349 N.C. at 88, 505 S.E.2d at 113. A trial

court's error in failing to submit statutory mitigating circumstances where there is sufficient evidence " 'is prejudicial unless the State can demonstrate on appeal that it was harmless beyond a reasonable doubt.' " *Jones*, 346 N.C. at 717, 487 S.E.2d at 722 (quoting *State v. Quick*, 337 N.C. 359, 363, 446 S.E.2d 535, 538 (1994)).

In the instant case, defendant did not request that the (f)(1) circumstance be submitted to the jury, thus implying defendant felt his prior history of criminal activity did not warrant its submission. The evidence of defendant's prior criminal activity was a conviction for indecent liberties with a minor approximately one year prior to this offense, previous recent assaults on Cotton, recently communicated death threats against Cotton, recently communicated death threats against Cotton's new boyfriend, and defendant's history of drowning young puppies and kittens. Given the extent of this recent criminal activity, the trial court properly could have determined that no reasonable juror could conclude that defendant's history of prior criminal activity was insignificant.

This case is more similar to cases where this Court has determined the trial courts have correctly not submitted the (f)(1) mitigator. *See, e.g.*, *Atkins*, 349 N.C. at 88, 505 S.E.2d at 114; *State v. Daughtry*, 340 N.C. 488, 522, 459 S.E.2d 747, 765 (1995), *cert. denied*, 516 U.S. 1079, 133 L. Ed. 2d 739 (1996). As in those cases, in the case *sub judice*, "defendant's prior history of criminal activity . . . is mainly related to assaultive behaviors which were primarily directed toward the ultimate victim of his violence and the ultimate cause of his being convicted of murder." *Atkins*, 349 N.C. at 89, 505 S.E.2d at 114. As previously mentioned, the record reveals defendant threatened Cotton because of her new boyfriend and defendant said if he could not have her, then her new boyfriend could not have her either. Defendant also threatened Cotton when he told her he was going to go to her job to pick her up one day, and if he saw her walk out with her new boyfriend, he would shoot them both. The record reveals defendant told two separate co-workers, Brinson and Arrington, that he was going to beat up Cotton's new boyfriend, and he also threatened to kill him.

Further, Cotton's aunt, Carolyn Williams, told officers investigating the case that defendant had threatened Cotton quite a few times and had beaten her a couple of times. Cotton also told Williams that defendant had threatened her since defendant had gone to court on 4 January 1996 concerning the child support matter. Cotton testified that on another occasion, defendant came to her house and

demanded to know with whom she was speaking on the phone. When Cotton said it was her new boyfriend, defendant grabbed the phone and threw it against the wall, breaking the phone. He also threw Cotton down on the sofa and struck her a couple of times in the face with his fists. When Cotton told their daughter Britteny to go across the street to Lassiter's house to call the police, defendant grabbed the child. Cotton told defendant to let go of the child, which he did, and Lassiter came over to see if Cotton was okay. Cotton testified she did not tell the police about the incident because of her shame at being beaten by defendant.

Defendant had a history of violence against Cotton, and he had also previously harmed another child when he took indecent liberties with a family member, his cousin's defenseless minor daughter. Moreover, defendant was still on probation for the conviction for indecent liberties with a minor when he planned and carried out the murder and attempted murders of his ex-girlfriend and their three children. Defendant's history of significant criminal conduct is one likely to influence the jury to recommend death, rather than life. "Combined with the evidence of his other prior criminal activities, these assaultive criminal activities make defendant's case for submission of the (f)(1) mitigating circumstance at least as weak, if not weaker, than the argument which we rejected [in other cases]." *Id.* Given the nature and recency of his record of assault, we cannot say the trial court erred in its determination to decline to submit the (f)(1) mitigator.

**[12]** Defendant also claims the trial court erred in denying his request for peremptory instructions on the statutory mitigating circumstances that the capital felony was committed while defendant was under the influence of mental or emotional disturbance, and that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, as set forth in N.C.G.S. § 15A-2000(f)(2) and (f)(6), respectively. Even though the trial court refused to give the requested peremtory instruction on the (f)(2) mitigating circumstance that the murder was committed while defendant was under the influence of a mental or emotional disturbance, one or more of the jurors still found it to exist. However, none of the jurors found the (f)(6) mitigator that defendant's ability to conform his conduct to the law was impaired.

A trial court should, if requested, give a peremptory instruction for any mitigating circumstance, whether statutory or nonstatutory, if it is supported by uncontroverted evidence. *See State v. White,* 349

N.C. 535, 568, 508 S.E.2d 253, 274 (1998), *cert. denied,* —— U.S. ——, 144 L. Ed. 2d 779 (1999). In the instant case, defendant's evidence supporting the (f)(2) and (f)(6) mitigating circumstances was in fact controverted. Defendant's experts both testified defendant had borderline mental intelligence and a reading disorder. However, the psychologist conceded defendant worked, earned his living, had a driver's license, and functioned within the limits of his intelligence. Neither expert and no other witness testified that defendant was in any way enraged or intoxicated at the time of the crimes. In contrast, the State's evidence tended to show defendant cold-heartedly and calmly planned to obtain a pesticide he knew was lethal from the farm where he worked; he did so and showed it to two people; he concocted a story for his need of the poison; he went to Cotton's house and put the poison in the Kool-Aid; he was seen after he had done so and appeared to be normal; he appeared at the hospital cunningly passing the blame to his girlfriend for his children's illness; and as they lay deathly ill or dying, he remained silent as to the actual cause of his children's and former girlfriend's suffering. Because we conclude that the evidence as to the (f)(2) and (f)(6) mitigating circumstances was conflicting, we overrule this assignment of error.

Defendant next raises four additional issues which he concedes this Court has previously decided against his position, including: (1) the aggravating circumstance that the murder was "especially heinous, atrocious, or cruel," as set forth in N.C.G.S. § 15A-2000(e)(9), is vague and overbroad; (2) the trial court erred in instructing the jury that it had the duty to impose the death penalty if it found that the mitigators failed to outweigh the aggravators; (3) the trial court erred by its use of the word "may" in sentencing Issues Three and Four; and (4) the trial court erred in instructing that nonstatutory mitigators are not mitigating as a matter of law. Defendant raises these issues for purposes of permitting this Court to reexamine its prior holdings and also for the purpose of preserving them for any possible further judicial review. We have considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. Therefore, these assignments of error are overruled.

Having concluded that defendant's trial and capital sentencing proceeding were free of prejudicial error, we must now review the record and determine: (1) whether the evidence supports the aggravating circumstances found by the jury and upon which the sentencing court based its sentence of death; (2) whether the sentence was

entered under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2).

We have thoroughly reviewed the record, transcript, and briefs in this case. We conclude the record fully supports the aggravating circumstances found by the jury. As aggravating circumstances, the jury found this crime: (1) was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and (2) was part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person or persons. N.C.G.S. § 15A-2000(e)(11). The evidence reveals that defendant coldly and designedly planned and carried out the murder of his child, and attempted to murder his other two children and their mother, his ex-girlfriend, because he did not want to pay child support and because he did not want anyone else to date his former girlfriend. Further, we find no indication that the sentence of death in this case was imposed under the influence of passion, prejudice, or any other arbitrary factor. We therefore turn to our final statutory duty of proportionality review.

[13] We begin our proportionality analysis by comparing this case to those cases in which this Court has determined the death penalty to be disproportionate. "One purpose of proportionality review 'is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury.' " *Atkins*, 349 N.C. at 114, 505 S.E.2d at 129 (quoting *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988)). This Court has determined the death sentence to be disproportionate on seven occasions. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate.

The instant case is distinguishable because this Court has emphasized that a murder in the home "shocks the conscience, not only because a life was senselessly taken, but because it was taken by the

surreptitious invasion of an especially private place, one [in which] a person has a right to feel secure.' " *State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987). In addition, "[w]e note that none of the cases in which the death penalty has been held disproportionate has involved the murder of a small child." *State v. Walls*, 342 N.C. 1, 71, 463 S.E.2d 738, 776-77 (1995), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 794 (1996). Further, "[w]e find it significant that none of the cases in which this Court has found the death penalty disproportionate involved multiple child victims." *State v. Billings*, 348 N.C. 169, 191, 500 S.E.2d 423, 436, *cert. denied*, —— U.S. ——, 142 L. Ed. 2d 431 (1998). "This Court weighs such a factor heavily against this adult defendant, as we have stated before that murders of small children, as well as teenagers, 'particularly shock[] the conscience.' " *Walls*, 342 N.C. at 72, 463 S.E.2d at 777 (quoting State *v. Artis*, 325 N.C. 278, 344, 384 S.E.2d 470, 508 (1989), *sentence judgment vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990)). Further, the poisoning caused a long, lingering, painful, and agonizing death of an innocent child. Accordingly, the facts and circumstances distinguish the instant case from those in which this Court held the death penalty disproportionate.

We also compare this case with the cases in which this Court has found the death penalty to be proportionate. While we review all of the cases in the pool of "similar cases" when engaging in our statutorily mandated duty, we have previously stated that we will not undertake to discuss or cite all of these cases each time we carry out that duty. *State v. Williams*, 308 N.C. 47, 81, 301 S.E.2d 335, 356, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983). It suffices to say we conclude that this case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence of death disproportionate. Thus, the sentence of death was neither excessive nor disproportionate.

We therefore conclude that defendant received a fair trial and capital sentencing proceeding, free of prejudicial error, and that the judgment of death recommended by the jury and entered by the trial court for the first-degree murder conviction, as well as the sentences imposed for the three first-degree attempted murder convictions, must be left undisturbed.

NO ERROR.