358IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-69

No. 421PA19

Filed 11 June 2021

STATE OF NORTH CAROLINA

v.

THOMAS ALLEN CHEEKS

Appeal pursuant to N.C.G.S. § 7A-31(c) from the decision of a unanimous panel of the Court of Appeals, 267 N.C. App. 579 (2019), finding no error in a judgment entered on 1 November 2017 by Judge Hugh B. Lewis in Superior Court, Gaston County. Heard in the Supreme Court on 22 March 2021.

*Joshua H. Stein, Attorney General, by Kimberly N. Callahan, Assistant Attorney General, for the State-appellee.*

*Glenn Gerding, Appellate Defender, by Daniel Shatz, Assistant Appellate Defender, for Defendant-appellant.*

ERVIN, Justice.

¶ 1 The issues before us in this case arise from challenges lodged by defendant Thomas Allen Cheeks to a judgment entered by the trial court based upon defendant's convictions for first-degree murder by starvation and negligent child abuse inflicting serious bodily injury. After careful consideration of defendant's challenges to the trial court's judgment, we affirm the Court of Appeals' decision.

Malachi Golden was born on 15 November 2010 in Gaston County. His mother, Tiffany Cheeks[1], was nineteen years old at the time of Malachi's birth and lived with her grandmother in Charlotte at that time. The child's father, William Golden, was not present for Malachi's birth and was never involved in his son's life.

When Malachi was four months old, Ms. Cheeks noticed that the child was experiencing spasms during which "his head would fall and drop." In January 2012, after discussing these occurrences with the child's primary care physician, Ms. Cheeks took Malachi to see a pediatric neurologist named Stephanie Robinett. After performing a number of tests, Dr. Robinett prescribed Malachi an anti-seizure medication called Zonisamide, which proved itself to be effective in improving his spasms.

In June 2012, Malachi and Ms. Cheeks moved to Gaston County. Shortly thereafter, Ms. Cheeks met defendant and entered into a romantic relationship with him. In July 2012, defendant moved into the apartment that Ms. Cheeks occupied with Malachi. Ms. Cheeks and defendant had two children together, one of whom was born in May 2013 and the other of whom was born in November 2014, and married in November 2013.

Malachi continued to see physicians throughout 2012. In September 2012, Malachi underwent a series of tests at the University of North Carolina at Chapel

---

[1] We will utilize Malachi's mother's married name throughout this opinion in the interest of consistency.

Hill. In the course of the testing process, treating physicians discovered that Malachi suffered from a genetic abnormality that consisted of an inverted 12 chromosome and a minor deletion of his 22 chromosome. After learning about Malachi's chromosomal abnormality, Ms. Cheeks authorized further treatment for her son. Ms. Cheeks did not, however, bring Malachi back to Chapel Hill so that he could receive such treatment.

From December 2012 until November 2013, Malachi received occupational and physical therapy as the result of referrals made by the Child Development Service Agency. Upon turning three years old in November 2013, Malachi aged out of the programs operated through the Child Development Service Agency and began to receive treatment from the Gaston County school system. In December 2014, however, Ms. Cheeks discontinued this treatment.

Shelly Kratt, one of the therapists assigned to provide services for Malachi through the Child Development Services Agency, conducted home visits at the Cheeks residence from April through November 2013. Ms. Kratt described Malachi as a "beautiful child" with "dark olive skin" and "dark beautiful eyes." In the aftermath of the treatment that he received from Ms. Kratt, Malachi's motor skills improved, permitting him to begin to walk and feed himself. Unfortunately, however, Ms. Kratt was frequently unable to conduct scheduled therapy sessions with Malachi because Ms. Cheeks would either cancel the session or refrain from answering the door when Ms. Kratt arrived. On the occasions when she was able to enter the home

and provide therapy for Malachi, Ms. Kratt observed that the Cheeks residence was "really dirty and messy" and "smelled really bad." According to Ms. Kratt, Malachi was always alone in a "Pack N' Play" playpen in a separate area of the home at the time of her arrival. Ms. Kratt noticed that, instead of participating in Malachi's therapy sessions, defendant would occupy himself by playing video games.

¶ 8        Susan Matznik provided occupational therapy to Malachi from December 2012 through October 2013 as the result of referrals from the Child Services Development Agency, with these therapy sessions having originally occurred at the Cheeks residence before being transferred to a clinic in Lincoln County. As had been the case with Ms. Kratt, Ms. Matznik had difficulty assessing and treating Malachi in light of the trouble that she experienced in getting an adult to answer the door at the Cheeks residence. Similarly, Ms. Matznik observed that the apartment was "dirty" and "smelled" and that Malachi was invariably alone in his playpen at the time of her arrival. According to Ms. Matznik, Malachi gained weight during the course of the therapy that she provided. On the other hand, Ms. Matznik remembered conducting a home visit at a time when defendant was the only adult in the residence in which she found Malachi "soaked with urine." Although Ms. Matznik attempted to change Malachi, she had to use paper towels to clean the child given defendant's inability to locate any baby wipes.

¶ 9        At the end of 2013, Malachi began participating in treatment sessions provided by Erica Reynolds, a pre-K itinerant teacher employed by the Gaston County public

school system. Ms. Reynolds described Malachi as having "big brown eyes, little chubby cheeks, [and] curly brown hair." Malachi missed several appointments with Ms. Reynolds as a result of Ms. Cheeks' failure to come to scheduled appointments without having sufficient reason for her non-attendance. During the one-year course of treatment that she provided for Malachi, Ms. Reynolds noticed that Malachi's ability to walk had improved, with the child having gone from "taking maybe one or two steps to being able to walk the length of the hallway at the elementary." On the other hand, Ms. Reynolds observed that Malachi appeared hungry during her visits, consistently "shovel[ing ] food in his mouth and gulp[ing ] his food down."

¶ 10        Linda Hutchins, who provided physical therapy for Malachi during the summer of 2013, remembered that Malachi appeared to be adequately nourished when she began treating the child. Ms. Hutchins discharged Malachi from treatment at some point during 2013 for attendance-related reasons. In 2014, Ms. Cheeks stopped administering Zonisamide to Malachi. The last treatment of any type that Malachi received was provided by Ms. Reynolds in December of 2014.

¶ 11        In spite of the fact that she was no longer treating Malachi, Ms. Hutchins returned to the Cheeks residence during January and February 2015 for the purpose of providing services to one of Malachi's younger siblings. At the time of one such visit in January of 2015, Ms. Hutchins observed that Malachi appeared to be "very thin." Upon being asked if Malachi was under a doctor's care, Ms. Cheeks responded that a physician had been seeing Malachi and that Malachi's needs were being

addressed even though Malachi had not been seen by a medical doctor since 31 October 2013.

¶ 12        On 22 January 2015, Ms. Hutchins and Michelle Hartman, a case coordinator with the Child Development Services Agency, came to the Cheeks residence for a visit. On that occasion, Ms. Hutchins observed that both Malachi and his younger sibling were hungry. However, while defendant fed Malachi's sibling, Ms. Hartman had to take care of feeding Malachi. Similarly, upon arriving at the Cheeks residence on 5 February 2015, Ms. Hutchins observed that Malachi and his younger sibling were hungry and that, while the younger sibling received food, no one gave Malachi anything to eat. No one from outside the Cheeks household ever saw Malachi alive after that date.

¶ 13        On 11 May 2015, Ms. Cheeks was away from the residence and at work for most of the day, having left Malachi in the care of defendant, who served as Malachi's primary caregiver during Ms. Cheeks' absences. Upon returning home that night, Ms. Cheeks discovered that Malachi was "not breathing and [was] blue." After calling 911 for help, Ms. Cheeks asked defendant to help attempt to resuscitate Malachi, a request with which defendant refused to comply.

¶ 14        Upon their arrival at the Cheeks residence, emergency medical technicians found Malachi's body lying on the floor in a bedroom. According to Travis Gilman, who was one of the emergency medical technicians dispatched to the Cheeks

residence, Malachi was "cold to the touch and . . . stiff." As a result, Mr. Gilman pronounced Malachi dead on the scene.

¶ 15        Jennifer Elrod, another emergency medical technician who came to the Cheeks residence in response to Ms. Cheeks' call, observed that Malachi's "facial features were very sunken," "his eyes were extremely sunken," "you could see every bone on his body," "you could count every rib in his rib cage," "his stomach was very sunken," and "there was no fat on his body." In addition, Ms. Elrod stated that Malachi's skin was gray, that his arms were "very skinny and very stiff," that Malachi's body was propped up on a pillow, and that there was "nothing" in the room other than a playpen and a highchair, with there being "no toys, nothing, it was just a very sparse room."

¶ 16        Upon his arrival at the Cheeks residence shortly after the arrival of the emergency medical technicians, Officer Justin Kirkland with the Gaston County Police Department observed that the kitchen was stocked with food items and found a bottle containing a thirty-day supply of Malachi's seizure medication, in which all thirty pills were still present, dated 24 July 2013. In addition, Officer Kirkland observed the presence of several flat screen televisions and video game consoles throughout the house. At the time that he "glanced in and passed by [Malachi's body,]" Officer Kirkland "saw what appeared to [be] a doll or — it didn't appear like a person on the floor . . . it didn't appear like a boy to me."

¶ 17        According to Officer Kirkland, Malachi appeared "small, skinny, and bony," with his head seeming to be disproportionately large when compared to his body.

Officer Kirkland testified that, despite the fact that Malachi was four years old and the fact that his clothes were sized for a 24-month old child, they were too baggy for his body. Officer Kirkland described Malachi as "laying on a pillow that was covered in numerous yellow stains and had a strong smell or odor of urine coming from the pillow."

¶ 18          Detective James Brienza of the Gaston County Police Department, who also came to the Cheeks residence in the aftermath of Malachi's death, stated that "Malachi didn't look or appear to be real" and "almost looked doll like." At the time that he interviewed defendant at the residence, Detective Brienza observed that defendant maintained an "emotionless" demeanor. In the course of his interview with Detective Brienza, defendant stated that he had fed Malachi earlier in the day and that Malachi had vomited before implying that Malachi's genetic disorder had something to do with his death. A few days later, Detective Brienza interviewed defendant for a second time and noticed that there were several inconsistencies in the statements that defendant made on these two occasions. For example, Detective Brienza noticed that defendant claimed to have given different types of food to Malachi in these two interviews and made no mention of his earlier claim that Malachi had vomited in the second interview.

¶ 19          Angela Elder-Swift with the Gaston County Medical Examiner's office examined Malachi's body before it was removed from the Cheeks residence on 11 May 2015. Ms. Swift "didn't even notice the decedent laying in the middle [of the bedroom

floor] because [he] didn't look real." According to Ms. Elder-Swift, Malachi "looked like a doll laying on a pillow" and "almost looked plastic." Ms. Elder-Swift testified that she "was able to see all of [Malachi's ribs]," that Malachi's "spine was showing" and "his skin was hanging off," and that Malachi was "very cachectic." In addition, Ms. Elder-Swift noticed that "[Malachi] had sores on places like pressure ulcers" and "pretty bad diaper sores." Furthermore, Ms. Elder-Swift said that Malachi's "eyes were very dry" and that "his mouth was extremely dry," facts which, in Ms. Elder-Swift's opinion, tended to suggest that Malachi was dehydrated. Upon removing Malachi's diaper, Ms. Elder-Swift discovered "what looked to be some blood that transferred from [the] bad sores." As best Ms. Elder-Swift could tell, no attempt had been made to perform cardio-pulmonary resuscitation upon Malachi.

¶ 20     On 12 May 2015, forensic pathologist Dr. Jonathon Privette performed an autopsy upon Malachi's body. Malachi weighed only nineteen pounds at the time of his death even though an average four-year old male child would be expected to weigh thirty-eight to forty pounds. Dr. Privette testified that "most of [Malachi's] organs seemed small for his age" and that "[d]ehydration could cause the organs to weigh less." Dr. Privette determined that Malachi had very little subcutaneous body fat, resulting in "tenting" of the skin, a condition that exists when "you can take the skin and pinch it and pull it up and it retains that position when you release the skin" and which "is a clinical indication of dehydration."

¶ 21    According to Dr. Privette, the sunken appearance of Malachi's eyes stemmed from a lack of periorbital fat, which provided yet another indication of malnutrition and undernourishment.  Dr. Privette found a "small amount of clear fluid with . . . scattered fragments of semi-solid white material consistent with dairy product" in Malachi's stomach.  In addition, Dr. Privette observed that Malachi had severe dermatitis on his buttocks and back, with this condition being attributable to diaper rash resulting from the fact that the child's skin had been in contact with urine or feces for lengthy periods of time.  According to Dr. Privette, Malachi's diaper rash was so severe that he suffered from "skin slippage," in which "the very superficial areas of the epidermis will basically slip away as you rub."

¶ 22    As a result of the fact that Malachi's body was in a state of isonatremic dehydration, Dr. Privette described Malachi's dehydration as chronic and stated that it would have occurred over "more than a few days," "probably weeks."  Upon detecting a scalp contusion and a subgaleal hemorrhage near Malachi's forehead, Dr. Privette opined that these conditions would have resulted from either "an object hitting the skin or the skin hitting a stationary object," with both of these injuries likely to have "happened very recently."  Finally, Dr. Privette noticed pressure ulcers on the inner portions of Malachi's knees at the point where his knees would touch. Although he sought medical records relating to Malachi for the purpose of obtaining additional information that could be used in determining the cause of the child's death, Dr. Privette was unable to locate any such records for 2014 or 2015.  As a

result, Dr. Privette initially concluded that Malachi was a "debilitated male child with failure to thrive"; that "[t]here is the clinical appearance of malnutrition and dehydration including severe underweight, sunken eyes, absence of body fat, muscle atrophy, and severe skin tenting"; and that "[m]alnutrition/dehydration may be the immediate cause of death in this case and would represent neglect in the proper context."

¶ 23        On 15 October 2015, Detective Brienza received Dr. Privette's autopsy report. In reviewing that document, Detective Brienza identified several additional difficulties in the statements that defendant had made to him. As a result, Detective Brienza interviewed defendant for a third time on 30 October 2015, at which point defendant admitted to Detective Brienza that he had killed Malachi. During this interview, defendant provided two different accounts concerning the manner in which Malachi's death had purportedly occurred. Initially, defendant told Detective Brienza that he had drowned Malachi in the bathtub. As their conversation progressed, however, defendant stated that he had "put his hands around Malachi's throat to keep him quiet" because he "was frustrated with Malachi." According to defendant, "he would put his hands around Malachi's throat and pick him up by his neck and choke him enough to quiet him" and that, "[o]nce Malachi would become limp, he would physically throw him in the Pack N' Play from a distance." As a result, defendant claimed to have killed Malachi by choking him to death and described "how he watched Malachi take his last few gasps of breath of air of life."

¶ 24       Dr. Privette read the transcript from the third interview that Detective Brienza had conducted with defendant and amended his autopsy report in light of the statements that defendant had made in that interview. In spite of the fact that there was no bruising to Malachi's neck, Dr. Privette opined in his amended report that, "based on the fact that [Malachi] is very debilitated, isn't going to be able to fight back, [and] isn't going to be able to try and put an end to this pressure on the neck," death by strangulation would be "totally consistent with [defendant's] description of the events as to what happened" on the night of Malachi's death. In addition, Dr. Privette stated that the description that defendant had given of Malachi's last moments was consistent with agonal respiration and that defendant's "explanation was spot on for what would [have] happen[ed]." Based upon defendant's account of the manner in which Malachi died, Dr. Privette changed his conclusion concerning the cause of Malachi's death from "failure to thrive" as the result of malnutrition and dehydration to strangulation, with "[n]utritional and medical neglect contibut[ing] to the death."

¶ 25       On 16 November 2015, the Gaston County grand jury returned a bill of indictment charging defendant with first-degree murder. On 6 February 2017, the Gaston County grand jury returned bills of indictment charging defendant with child abuse inflicting serious bodily injury on the basis of an allegation that defendant had "plac[ed] his hands around Malachi Golden's throat restricting air and blood flow resulting in Malachi Golden's death" and negligent child abuse inflicting serious

bodily injury on the basis of an allegation that defendant had "show[ed] reckless disregard for human life by committing a grossly negligent omission . . . by not providing [Malachi] with medical treatment in over 1 year, despite the child having a disability, and further, not providing the child with proper nutrition and medicine resulting in weight loss and failure to thrive." On 26 September 2017, defendant requested the trial court to conduct his trial while sitting without a jury. On 2 October 2017, defendant filed a formal waiver of his right to a jury trial. After conducting a colloquy with defendant, the trial court granted defendant's motion for bench trial on 4 October 2017.

The charges against defendant came on for trial before the trial court sitting without a jury at the 23 October criminal session of the Superior Court, Gaston County. At the close of the State's evidence, defendant unsuccessfully moved to dismiss the charges that had been lodged against him for insufficiency of the evidence. While testifying in his own behalf, defendant made a number of statements that conflicted with those that he had made during his previous interviews with Detective Brienza, including assertions that he had fed Malachi several times on the day of his death. On cross examination, defendant testified that the explanations that he had given to Detective Brienza concerning the manner in which Malachi had died were "lie[s]":

> Q. You gave vivid details. You had long dialogs about what you did to Malachi?

> A.      Yes, ma'am, but I did not do those things to my son.
>
> Q.      You heard Dr. Privette say that you are spot on with your description of this choking, that that was exactly how it would look if a child was choked and you gave vivid details of that. You knew what it would look like?
>
> A.      No, I didn't, because I never choked anyone out.
>
> . . . .
>
> Q.      You are saying that's all a lie?
>
> A.      Yes, ma'am.

After denying that he had strangled Malachi, defendant expressed an inability to explain how the child had become so skinny or why Dr. Privette had found nothing in his stomach during the autopsy. At the close of all of the evidence, defendant unsuccessfully renewed his motion to dismiss for insufficiency of the evidence.

After conferring with the parties for the purpose of discussing the applicable law and the procedures that it would use in determining defendant's guilt or innocence, the trial court developed a set of "jury instructions" that it would utilize in deciding the case, with those instructions including, over defendant's objection, a consideration of the extent, if any, to which defendant was guilty of murder by starvation. *See* N.C.G.S. §14-17(a) (stating that "[a] murder which shall be perpetrated by means of . . . poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate, and premeditated killing . . . shall be deemed to be murder in the first degree"). In the course of developing these instructions, the trial court identified the following definitions of "starvation":

> Starvation is the result of a severe or total lack of nutrients needed for the maintenance of life. https://medicaldictionary.thefreedictionary.com/starvation
>
> To starve someone is to "kill with hunger;' to be starved is to "perish from lack of food." Starving: Medical Definition, Merriam-Webster Dictionary, http://www.merriam-webster.com/medical/starving (last visited Apr. 16, 2012).
>
> COMMENT: KinderLARDen Cop: Why States Must Stop Policing Parents of Obese Children. 42 Seton Hall L. Rev. 1783. 1801
>
> To starve someone is the act of withholding of food, fluid, nutrition, *Rodriguez v. State*, 454 S.W. 3d 503, 505 (Tex. Crim. App. 2014)
>
> Starving can result from not only the deprivation of food, but also liquids. Deprivation of life-sustaining liquids amounts to starvation under the statute. A specific intent to kill is . . . irrelevant when the homicide is perpetrated by means [of] starving, or torture. *State v. Evangelista*, 319 N.C. 152 (1987)
>
> When a homicide is perpetrated by means of poison, lying in wait, imprisonment, starving or torture, the means and method used involves planning and purpose. Hence, the law presumes premeditation and deliberation. The act speaks for itself. *State v. Dunheen*, 224 N.C. 738, 739 (1944).

After defendant's trial counsel claimed to have "found almost the exact same thing" in his research, the trial court relied upon these definitions during its deliberations.

On 1 November 2017, the trial court entered an order in which it made the following findings of fact, among others:

> 6. Malachi Golden died on May 11, 2015.
>
> . . . .

10.   At the time of death, Malachi Golden had a plastic appearance with sunken eyes, protruding collarbones, protruding spine, protruding joints and protruding ribs.

11.   At the time of death, Malachi Golden had very little body fat or muscle tissue.

        . . . .

15.   The autopsy revealed that Malachi Golden was malnourished and dehydrated.

16.   At the time of death, Malachi Golden weighed 19 pounds compared to the average weight of a 38-40 pounds for a four-year-old boy.

        . . . .

18.   At the time of death, Malachi Golden had a very wasted appearance.

        . . . .

20.   Malachi Golden suffered from acute diaper rash with extensive inflammation on his buttocks and groin.

        . . . .

22.   Malachi Golden suffered from acute diaper rash for an extended period without treatment.

        . . . .

36.   The caregivers ceased all medication, medical care and therapy sessions without consulting Malachi Golden's physicians.

37.   For the last few months of his life, Malachi Golden was cloistered from all adults except Tiffany Cheeks and Defendant.

38.   During this period, Defendant became the primary caregiver for Malachi Golden and provided up to 80 percent of the child's care.

. . . .

49.     Both Defendant and Ms. Tiffany Cheeks recanted their interviews with the police where they admitted wrongdoing regarding the care of Malachi Golden.

50.     Defendant contradicted himself several times on the stand during his testimony during the trial.

Based upon these findings of fact, the trial court concluded as a matter of law that:

7.      Defendant committed a grossly wanton and negligent omission with reckless disregard for the safety of Malachi Golden by:

    a.      Allowing [Malachi] to remain in soiled diapers until acute diaper rash formed on the groin and bottom of Malachi Golden which included open sores and ulcers; and

    b.      Keeping [Malachi] in a playpen for so long of period that bed sores formed on Malachi Golden's legs and knees.

8.      The above sub-paragraphs caused the child extreme pain and with reckless disregard for human life.

9.      To starve someone is to "kill with hunger."

10.     A reasonably careful and prudent person could foresee that failing to provide a child's nutritional needs would cause death.

11.     By feeding Malachi Golden typically only once a day and watching the child waste away to skin and bones, the Defendant intentionally starved the four-year-old boy.

12.     Malachi Golden perished from the lack of food and life-sustaining liquids.

13.     Defendant's starving Malachi Golden was the proximate cause of the child's death.

14.     Defendant's failure to take any action to seek medical help, through any means possible, for Malachi Golden

> as the child wasted away from lack of nutrients
> needed for the maintenance of life was the commission
> of a homicide.

Based upon these findings of fact and conclusions of law, the trial court found defendant guilty of first-degree murder on the basis of starvation and negligent child abuse inflicting serious bodily injury while refusing to find defendant guilty of first-degree murder on the basis of malice, premeditation, and deliberation, torture, or the felony murder-rule using child abuse inflicting serious bodily injury as the predicate felony and child abuse inflicting serious bodily injury.[2] After making these determinations, the trial court consolidated defendant's convictions for judgment and entered a judgment sentencing defendant to a term of life imprisonment without the possibility of parole. Defendant noted an appeal from the trial court's judgment to the Court of Appeals.

¶ 29      In seeking to persuade the Court of Appeals to overturn the trial court's judgment, defendant argued, among other things, that (1) the trial court had erred by denying his motion to dismiss for insufficiency of the evidence on the grounds that the record did not suffice to support defendant's conviction for first-degree murder on

---

[2] The parties have not argued that the trial court erred by adopting the procedures that it utilized to decide this case. Although we are inclined to agree with the Court of Appeals that there was no necessity for the trial court to have instructed itself concerning the applicable law or to enter an order containing findings of fact and conclusions of law, *State v. Cheeks*, 267 N.C. App. 579, 595 (2019), we do not believe that the trial court erred by proceeding as it did and will evaluate defendant's challenges to the trial court's judgment utilizing the approach that the trial court elected to adopt in deciding the relatively novel issues that were before it in this case.

the basis of starvation; (2) the trial court had committed plain error and had erred by failing to instruct itself that malice was an essential element of first-degree murder on the basis of starvation and by failing to make a separate determination that defendant had acted with malice; and (3) that the trial court had erred by convicting defendant of negligent child abuse inflicting serious injury based upon a theory that defendant had allowed Malachi to develop sores and pressure ulcers in spite of the fact that the indictment that had been returned against defendant for the purpose of charging him with that offense did not support such a determination. *State v. Cheeks*, 267 N.C. App. 579, 599, 602, 605–06, 610 (2019).

¶ 30 In rejecting these contentions, the Court of Appeals began by noting that no reported decision by either this Court or the Court of Appeals had directly addressed the issue of a convicted criminal defendant's guilt of first-degree murder on the basis of starvation and that neither N.C.G.S. § 14-17(a) nor our appellate jurisprudence defined the term "starv[ation]" for purposes of that statutory provision. *Cheeks*, 267 N.C. App. at 599–600. Based upon this Court's decision in *State v. Evangelista*, 319 N.C. 152 (1987), the Court of Appeals determined that "starving" can be defined as "death from the deprivation of liquids or food 'necessary in the nourishment of the human body,' " *Cheeks*, 267 N.C. at 602 (quoting *Evangelista*, 319 N.C. at 158), while rejecting defendant's contention that murder by starvation requires the complete denial of all food or water, or both, for a certain period of time, concluding that "[t]he deprivation need not be absolute and continuous for a particular time period." *Id.*

¶ 31      In addition, the Court of Appeals held that the record contained sufficient evidence to support a determination that starvation proximately caused Malachi's death. *Id.* at 610. In spite of the fact that Dr. Privette's amended written report and his trial testimony stated that the findings that he had made during the autopsy that he performed upon Malachi's body could be consistent with strangulation, the Court of Appeals noted that the only direct evidence that Malachi died as the result of strangulation stemmed from the statement that defendant gave to Detective Brienza, an account that defendant had repudiated at trial and which the trial court found to lack credibility. *Id.* at 608–09. In addition, the Court of Appeals pointed out that Dr. Privette had testified that, in the absence of defendant's claim to have strangled Malachi, he would not have amended his initial autopsy report, which concluded that malnutrition and dehydration were the immediate causes of Malachi's death. *Id.* According to the Court of Appeals, the trial court acted well within its authority as the trier of fact in rejecting defendant's extra-judicial claim to have strangled Malachi and the related cause of death determination set out in Dr. Privette's amended report. *Id.* at 609. As a result, given the absence of any additional evidence tending to show that Malachi died as the result of strangulation, the Court of Appeals concluded that there was ample evidence to support a determination that Malachi's death was the proximate result of the deprivation of food and water at a time when defendant was his primary caregiver. *Id.*

¶ 32          Secondly, the Court of Appeals determined that this Court "has clearly held that no separate showing of malice is required for first degree murder by the means set forth" in N.C.G.S. § 14-17(a). *Id.* at 605 (citing *State v. Smith*, 351 N.C. 251, 267 (2000)). For that reason, the Court of Appeals concluded that, "[j]ust as with poisoning or torture, murder by starving 'implies the requisite malice, and a separate showing of malice is not necessary.' " *Id.* at 606 (quoting *Smith*, 351 N.C. at 267). As a result, the Court of Appeals held that "the trial court did not err by not making a finding or conclusion as to malice." *Id.*

¶ 33          Finally, the Court of Appeals held that the trial court did not err by convicting defendant of negligent child abuse inflicting serious bodily injury on the basis of a factual theory that had not been alleged in the indictment on the grounds that the indictment that had been returned against defendant for the purpose of charging him with negligent child abuse alleged all of the essential elements of that offense and that the more specific factual allegations contained in the indictment constituted nothing more than mere surplusage. *Id.* at 614. For that reason, the Court of Appeals rejected defendant's contention that there was a fatal variance between the indictment and the theory of guilt upon which the trial court's instructions and findings and conclusions rested. *Id.* Moreover, given the fact that the indictment that had been returned for the purpose of charging defendant with negligent child abuse inflicting serious injury alleged that defendant had failed to "provid[e] the child with medical treatment in over one year despite having a disability," the Court of

Appeals determined that the allegations set out in the indictment were supported by the evidence that Malachi was suffering from severe diaper rash at the time of his death and the evidence that Malachi had not seen a physician during the last year of his life. *Id.* On 1 April 2020, this Court allowed defendant's request for discretionary review of the Court of Appeals' decision in this case.

¶ 34       In seeking to persuade us to overturn the Court of Appeals' decision, defendant argues that the trial court erred by failing to dismiss the first-degree murder charge that had been lodged against him on the grounds that the record failed to contain sufficient evidence to support a finding that Malachi's death was proximately caused by starvation. In support of this contention, defendant asserts that Dr. Privette's testimony provided the only expert testimony concerning the cause of Malachi's death and that Dr. Privette had unequivocally testified that Malachi had died as the result of asphyxia secondary to strangulation. Defendant claims that, "[a]lthough the Court of Appeals was correct that the trial court was free to reject Dr. Privette's opinion that Malachi died of strangulation," "it does not necessarily follow that the trial court could rely on Dr. Privette's previous opinion, even if that opinion really had been that Malachi died of starvation." In defendant's view, expert testimony was necessary to establish the cause of Malachi's death given that the cause of Malachi's death would not have been reasonably apparent to a lay juror. Defendant reasons that, "[a]lthough several of [Dr. Privette's] findings note that Malachi was malnourished and dehydrated at the time of his death, none of these findings relate to cause of

death," with "Malachi's emaciated and dehydrated condition as depicted in the pictures [being insufficient to] explain why Malachi was alive on May 10, 2015 but dead on May 11, 2015." As a result, defendant argues that, "because there was no other expert testimony to support any other cause of death, and because expert testimony was necessary to establish the cause of Malachi's death, the evidence was insufficient to support the trial court's verdict that Mr. Cheeks was guilty of murder by starvation."

¶ 35        Secondly, defendant argues that, in light of the manner in which murder and manslaughter are defined at common law, the State was required to make a separate showing of malice in order to prove defendant's guilt of murder on the basis of starvation. In support of this argument, defendant asserts that N.C.G.S. § 14-17(a) did not abrogate the common law requirement that proof of malice was necessary to sustain a murder conviction. As a result, defendant contends that the trial court committed plain error by failing to instruct itself that malice is a necessary prerequisite for a conviction of first-degree murder based upon a theory of starvation and erred by failing to make a specific finding that defendant acted with malice.

¶ 36        In the alternative, defendant argues that, if malice is deemed to be implied in the event of a murder by starvation in a manner similar to the way in which malice has been deemed to be implied in connection with the other forms of murder specified in N.C.G.S. § 14-17(a), *see, e.g., Smith*, 351 N.C. at 267 (holding that malice is implied through the act of killing another by torture or poison), then "starving" must be

defined narrowly in order to ensure that only malicious homicides are punished as first-degree murder. In defendant's view, this Court held that malice was implied in murders by torture and poisoning because such killings require "intentional infliction of grievous pain and suffering." *Smith*, 351 N.C. at 267. In order to ensure consistency between murders by torture and poisoning, on the one hand, and murder by starvation, on the other, defendant asserts that it is necessary that "starving" be defined as involving a complete deprivation of food and water, with this Court having adopted such a definition in dicta in *State v. Evangelista*, 319 N.C. 152, 158 (1987) (affirming a first-degree murder based upon premeditation and deliberation in a case in which the defendant held others, including an infant, hostage while denying them food or water, resulting in the infant's death, and stating that, in addition, the record evidence would have supported a first-degree murder conviction on the basis of a theory of starvation). According to defendant, since the common law did not view the "act of allowing a child to die of malnutrition" as "inherently malicious" and since the enactment of N.C.G.S. § 14-17(a) "did not change the common law definition of murder," this Court should either require the State to make a separate showing of malice or define starvation in the narrowest possible manner.

¶ 37 Finally, defendant contends that his conviction for negligent child abuse inflicting serious bodily injury rested upon findings that Malachi suffered from bedsores, pressure ulcers, and diaper rash while the indictment alleged that defendant's guilt rested upon a failure to provide Malachi with medical treatment

and proper nutrition. In defendant's view, the alleged discrepancy between the basis for the claim of serious bodily injury alleged in the indictment and the injuries depicted in the trial court's findings resulted in a conviction that rested upon "a theory not charged in the indictment [that] constitutes reversible error," with the Court of Appeals having erred by relying upon its own earlier decision in *State v. Qualls*, 130 N.C. App. 1, 8 (1998) (holding that "if an indictment contains an averment which is not necessary in charging the offense, it may be disregarded as inconsequential"), which defendant contends to be in conflict with prior decisions of this Court, and by holding that the factual allegations set out in the indictment charging defendant with negligent child abuse inflicting serious injury were nothing more than "mere surplusage."

¶ 38        The State, on the other hand, argues that the record contains ample evidence tending to show that Malachi's death was proximately caused by starvation. In the State's view, the evidence of starvation in this case was "extreme and obvious" and that, by doing nothing more than "viewing the condition of Malachi's body, any person of average intelligence would be able to determine, at a minimum, that starvation substantially contributed to his death." In addition, the State asserts that the testimony of Dr. Privette coupled with the circumstances surrounding the changes that he made to his autopsy report provided any necessary expert support for the trial court's cause of death determination. In view of the fact that the trial court expressly found as a fact that defendant's testimony conflicted with the admissions that he had

made at an earlier time, the State contends the trial court had ample justification for deciding that defendant was not a credible witness, with the same being true of any expert opinion testimony predicated upon defendant's prior statements to Detective Brienza.

¶ 39        Secondly, the State argues that malice is implied in connection with the specific means of killing that are treated as first-degree murder in N.C.G.S. § 14-17(a) given defendant's "willful intent to withhold life sustaining food and water, rather than mere negligence." In support of this contention, the State directs our attention to *State v. Dunheen*, 224 N.C. 738 (1944), which it describes as holding that, "where the murder is perpetrated by means of poison, lying in wait, imprisonment, starving, or torture, the means and method used involve planning and purpose, and the act speaks for itself." *Id*. at 740. In view of the fact that the sufficiency of the evidence to support a conviction for first-degree murder by starvation is a matter of first impression in North Carolina, the State identifies decisions from a number of other jurisdictions which hold that the commission of such a murder inherently involves malice given that the length of time needed to starve someone to death shows "coldness and deliberation, for within that time there was ample opportunity for reflection." *See, e.g., Commonwealth v. Tharp*, 574 Pa. 2d 272 (2002). As a result, the State asserts that the operative distinction between conduct that constitutes murder and conduct that constitutes manslaughter hinges upon whether the defendant did or did not act willfully.

¶ 40        In addition, the State responds to defendant's contention that starvation for purposes of N.C.G.S. § 14-17(a) should be limited to situations involving the complete deprivation of food and water by arguing that the adoption of such a definition would unduly restrict the types of conduct that would be deemed to constitute first-degree murder for purposes of N.C.G.S. § 14-17(a). More specifically, the State contends that the adoption of "defendant's argument would lead to the illogical result that giving a victim a drop of food or water each day would shield a defendant from a charge of first-degree murder by starvation in North Carolina," with there being no reported decision of any court holding that the viability of a "charge of murder was dependent upon a complete deprivation of food and water as a matter of law." On the contrary, the State asserts that numerous decisions from other jurisdictions hold that evidence tending to show that defendants who starved victims over a prolonged period of time could appropriately be convicted of murder even though they occasionally provided food to their victims.

¶ 41        Finally, the State denies that there was a fatal variance between the allegations of the indictment charging defendant with negligent child abuse inflicting serious bodily injury and the evidence upon which the trial court relied in convicting defendant of that offense. According to the State, the Court of Appeals correctly held that the factual allegations set out in the negligent child abuse indictment constituted mere surplusage in light of several decisions by this Court which, in the State's view, hold that an indictment need only allege the essential elements of the crime that the

grand jury was attempting to charge and that any factual allegations above and beyond the elements of the offense have no bearing upon the validity of the defendant's conviction. In addition, the State argues that *Qualls* had not been overruled by the cases upon which defendant relies given that they involve allegations that specified the legal theory upon which the State relied in seeking to convict defendant rather than mere recitations of non-essential factual information. *See, e.g., State v. Silas*, 360 N.C. 377, 379 (2006) (finding the existence of a fatal variance when the State's evidence did not tend to show that the defendant intended to commit the felony enumerated in the indictment charging the defendant with burglary). The State also argues that, even if the factual allegations upon which defendant's argument relies were not mere surplusage, those allegations support the theory of guilt embodied in the trial court's conclusions given that the indictment alleged both malnutrition and failure to provide medical care while the record evidence tending to show that Malachi suffered from diaper rash, bedsores, and pressure ulcers sufficed to support a determination that defendant was negligent in failing to "provid[e] the child with medical treatment" causing serious bodily injury.

¶ 42 This Court reviews the sufficiency of the evidence to support a criminal conviction by evaluating "whether there is substantial evidence of each essential element of the offense charged, or of a lesser included offense of that charged." *State v. Workman*, 309 N.C. 594, 598 (1983). "The evidence is to be considered in the light most favorable to the State," with the State being "entitled to . . . every reasonable

inference to be drawn therefrom" and with any "contradictions and discrepancies [being left] for the jury to resolve . . . ." *Id.* at 598–99 (quoting *State v. Powell*, 299 N.C. 95, 99 (1980)). In the event that the record contains sufficient evidence, "whether direct, circumstantial, or both," "to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury." *State v. King*, 343 N.C. 29, 36 (1996) (quoting *State v. Locklear*, 322 N.C. 349, 358 (1988)).

¶ 43        According to well-established North Carolina law, a conviction for an unlawful homicide requires sufficient evidence that a defendant's unlawful act proximately caused the victim's death. *State v. Minton*, 234 N.C. 716, 721 (1952). Although expert medical testimony is needed to support the making of the necessary proximate cause determination in instances in which an average layman is unable to determine the cause of death, such evidence is not necessary when a "person of average intelligence would know from his own experience or knowledge that the wound was mortal in character" given that "the law is realistic when it fashions rules of evidence for use in the search for truth." *Id.*

¶ 44        A careful review of the record evidence satisfies us that the trial court had ample justification for concluding that Malachi died as a proximate result of starvation. According to testimony provided by a number of persons responsible for providing him and his sibling with various forms of treatment during the last two years of his life, Malachi was not fed even though he was ravenously hungry and

looking considerably thinner in the months leading up to his death. Similarly, the emergency medical technicians who responded to Ms. Cheeks' call in the aftermath of Malachi's death noticed the malnourished state of Malachi's body, which some of them initially mistook for a doll. In addition, the physical evidence set out in Dr. Privette's autopsy report unequivocally demonstrates that Malachi was severely malnourished and dehydrated.

¶ 45      Moreover, the record provides ample expert support for a determination that Malachi died of starvation.[3] According to Dr. Robinette, the only thing that "would cause Malachi or any child to look like" the child described by the emergency medical technicians and depicted in the autopsy report and related photographs was "starvation." Although Dr. Privette's amended report attributed Malachi's death to asphyxia secondary to strangulation, the record clearly demonstrates that his opinion to that effect rested solely upon the information that defendant provided in his final interview with Detective Brienza. In light of the fact that Dr. Privette made no physical findings in support of the cause of death determination set out in his amended report and the fact that the record provided more than sufficient support for a determination that defendant's claim to have strangled Malachi lacked credibility, we have no difficulty in concluding that the trial court had ample

---

[3] For this reason, we need not determine whether defendant or the State has the better of the dispute over the extent to which expert testimony concerning the cause of death was necessary in this case.

justification for rejecting any contention that Malachi died from strangulation. *See State v. Morganherring*, 350 N.C. 701, 729 (1999) (holding that, in the event that an expert witness gives testimony regarding the cause of a victim's death, the degree of "familiarity with the sources upon which he based his opinion is certainly relevant as to the weight and credibility the jury should give to [the testimony]"). Furthermore, in light of the fact that Dr. Privette's initial autopsy report appears to have been admitted into evidence without being subject to any limitation, we know of no reason why the trial court was not entitled to rely upon Dr. Privette's initial conclusion that "[m]alnutrition may be the immediate cause of death in this case," particularly given the fact that Dr. Privette returned to the theme of starvation in his amended report by stating that "nutritional and medical neglect contributed to this death" in his amended report.[4] As a result, for all of these reasons, the record contained more than sufficient support for the trial court's determination that Malachi died as a proximate result of starvation.

¶ 46        Similarly, we conclude that the trial court did not commit plain error or err by failing to instruct itself concerning the issue of malice or to make a separate finding

---

[4] Although defendant emphasizes the fact that Dr. Privette's initial report used the word "may" in attributing Malachi's death to malnutrition and dehydration in arguing that that testimony failed to satisfy the evidentiary principle set out in *Holley v. ACTS, Inc.,* 357 N.C. 228, 233 (2003) (stating that "expert testimony as to the *possible* cause of a medical condition is admissible," "it is insufficient to prove causation"), we conclude that defendant's argument lacks merit given that, when read it its entirety, it is clear that Dr. Privette's report indicates that malnutrition and dehydration probably contributed to Malachi's death.

that defendant acted with malice in connection with the killing of Malachi. As this Court has previously held, the act of torture is indistinguishable from the act of poisoning for purposes of the specifically enumerated types of killings set out in N.C.G.S. § 14-17(a), *Smith*, 351 N.C. at 267, with torture and poisoning both constituting wanton acts that are necessarily conducted "in such a manner as to manifest depravity of mind, a heart devoid of a sense of social duty, and a callous disregard for human life." *Id.* (quoting *State v. Crawford*, 329 N.C. 466, 481 (1991)). As a result, the showing of malice necessary for guilt of murder is inherent in the act of fatally torturing or poisoning another human being. *Id.*

As is the case with acts of torture or poisoning resulting in the death of another person, the intentional withholding of the nourishment and hydration needed for survival resulting in the death of that other person at a time when the person in question is unable to provide these things for himself or herself shows a reckless disregard for human life and a heart devoid of social duty. *See State v. Wilkerson*, 295 N.C. 559, 916 (1978) (stating that, if "an act of culpable negligence . . . 'is done so recklessly or wantonly as to manifest depravity of mind and disregard of human life,' it will support a conviction for second degree murder") (quoting *State v. Wrenn*, 279 N.C. 674, 687 (1971) (Sharp, J., dissenting)). Put another way, the act of starving another person to death takes time, during which the defendant has ample opportunity to reflect upon his or her conduct, to take mercy upon the victim, and to be increasingly aware of the other person's condition, with a decision to intentionally

deprive another person of needed nutrition and hydration resulting in death being, under such circumstances, inherently malicious as a matter of law. Thus, the malice necessary for guilt of murder is inherent in the intentional withholding of hydration or nutrition sufficient to cause death. As a result, we hold that the act of starving another person to death for purposes of N.C.G.S. § 14-17(a), without more, suffices to show malice, so that the trial court did not commit plain error by failing to instruct itself to make a separate finding of malice or err by failing to make a separate determination that defendant acted maliciously in its findings of fact and conclusions of law.[5]

¶ 48      The record contains testimony from multiple witnesses tending to show that food was present in the Cheek residence and that Malachi's siblings received sufficient nutrition and hydration to survive. Although the evidence clearly depicts Malachi as hungry and dehydrated during the months leading to his death, defendant made no effort to seek medical attention for Malachi during that period of time and, at most, fed Malachi only once each day despite the fact that he served as Malachi's primary caretaker for a great deal of the time. For that reason, we further hold that the record and the trial court's findings contain ample evidence tending to show that defendant proximately caused Malachi's death by intentionally depriving him of

---

[5] In view of the fact that there is not and never has been a requirement that the trial court or jury make a separate finding of malice in order to convict a defendant of first-degree murder on the basis of starvation pursuant to N.C.G.S. § 14-17(a), our decision does not subject defendant to impermissible punishment on the basis of *an ex post facto* law.

needed hydration and nutrition, a showing that amply supports the trial court's decision to convict defendant of murder by starvation pursuant to N.C.G.S. § 14-17(a).

¶ 49          In addition, we are unable to accept defendant's contention that starvation for purposes of N.C.G.S. § 14-17(a) should be understood to require proof that the defendant subjected the alleged victim to a complete deprivation of food and hydration. Aside from the fact the language from our decision in *Evangelista* upon which defendant relies is dicta, nothing in the related discussion in any way suggests that a complete deprivation of nutrition and hydration is necessary for guilt of first-degree murder on the basis of starvation pursuant to N.C.G.S. § 14-17(a). Instead, that discussion simply indicates that murder by starvation occurs in the event that the defendant completely deprives the victim of food and drink, a statement that is self-evidently true. In the same vein, nothing in *State v. Fritsch*, 351 N.C. 373 (2000), upon which defendant also relies, makes the difference between guilt of murder or manslaughter contingent upon the amount of nutrition or hydration that the alleged victim failed to receive. Finally, the adoption of defendant's definition of starvation for purposes of N.C.G.S. § 14-17(a) would produce what strikes us as an absurd result in certain cases, *see Mazda Motors of Am., Inc. v. Southwestern Motors, Inc.*, 296 N.C. 357, 361 (1979) (quoting *State v. Barksdale*, 181 N.C. 621, 250, 253 (1921)), given that, under defendant's definition, a person who kills someone else by withholding virtually all, but not all, food and drink would not be guilty of murder by starvation. As a result, we reject defendant's contention that murder by starvation pursuant to

N.C.G.S. § 14-17(a) is limited to situations involving the complete deprivation of hydration and nutrition.

¶ 50        Finally, we hold that defendant's contention that there is a fatal discrepancy between the allegations of the indictment charging defendant with negligent child abuse inflicting serious injury and the trial court's factual justification for convicting defendant of that offense lacks merit.[6]  As we have already noted, the indictment charging defendant with negligent child abuse inflicting serious injury alleges that defendant failed to provide Malachi "with medical treatment" for over one year, "despite the child having a disability," and with failing to "provid[e] the child with proper nutrition and medicine, resulting in weight loss and failure to thrive."  In our opinion, the trial court's determinations that defendant "allow[ed] the child to remain in soiled diapers until acute diaper rash formed on the [child's] groin and bottom," resulting in "open sores and ulcers," and that defendant kept "the child in a playpen for so long a period of time that bed sores formed on [his] legs and knees" are fully consistent with the grand jury's allegations that defendant deprived Malachi of medical treatment, resulting in the infliction of serious bodily injury.  As a result, we hold that the trial court's findings and the relevant allegations of the indictment are

---

[6] In view of our determination that the trial court's findings do, in fact, support the theory of guilt alleged in the indictment, we need not determine whether the Court of Appeals correctly concluded that the factual allegations set out in the indictment are or are not mere surplusage or whether defendant properly preserved this claim for purposes of appellate review and express no opinion concerning the manner in which either of these issues should be decided.

fully consistent with each other.  As a result, for all of these reasons, the Court of

Appeals decision should be affirmed.

AFFIRMED.